DETERMINED IN THE

# COURT OF ERRORS AND APPEALS

OF THE

# STATE OF NEW-JERSEY,

AT JUNE TERM, 1852.

---

## MARY BELL v. EDWARD GOUGH.

1. If the owner of land bounded by the shore upon tide water make improvements upon or reclaim the shore adjoining his lands, the part of the shore so improved or reclaimed belongs to him, and cannot be granted by the state.

2. In New Jersey the common law rule prevails, by which the title to lands bounded on tide waters extends to ordinary high water mark only.

3. Riparian owners have a vested right in the benefits and advantages arising from their adjoining the water, of which they cannot be deprived without compensation.—*Per* NEVIUS, OGDEN, and POTTS, Justices.

---

This was an action of trespass, brought in the Supreme Court by Edward Gough (a tenant of John B. Coles and others) against Mary Bell, for a trespass in breaking the close of the plaintiff, and cutting and carrying away the grass, &c., there growing. The plea of the defendant was *liberum tenementum*, and the only question was the title to the *locus in quo*. Upon the trial at the Circuit, a verdict *pro forma* was found for the plaintiff upon the issue of title, subject to the opinion of the Supreme Court upon a state of the case agreed

624

Bell v. Gough.

upon by counsel, with leave to turn the state of the case into a special verdict and to bring a writ of error.

At the July term of the Supreme Court, 1850,* the Supreme Court ordered judgment to be entered for the plaintiff. The defendant elected to turn the state of the case into a special verdict, and removed the proceedings to this court by writ of error.

By this verdict it was found that the East Jersey proprietors, by a survey dated May 21, 1802, granted to Elisha Boudinot a tract of 53½ acres, lying on the shore and under the waters of the Hudson river, below and adjoining high water mark, in the township of Bergen, in the county of Bergen (now Hudson); that the *locus in quo* is included in the boundaries of that survey, and was then below high water mark and above low water mark, forming part of the shore fronting upon and adjoining land then held by Robert Kennedy, under whom the plaintiff claims; that Elisha Boudinot, by deed dated January 2, 1804, conveyed said 53½ acre tract to Nathaniel Budd, and that the title of Nathaniel Budd had passed by conveyances found in the special verdict to the defendant, Mary Bell.

That, in 1804, Nathaniel Budd was possessed of the Kennedy tract, being the upland adjoining the *locus in quo*, as tenant under Kennedy, and that, on the 22d day of November, 1802, the legislature of New Jersey, upon the petition of Nathaniel Budd, passed an act,† which recited that the title of said upland was in dispute between Kennedy and the township of Bergen, and that Budd had built a dock and ferry stairs on lands adjoining the premises in dispute, and authorized the laying out of a four rod road to said dock, and authorized Budd to erect and continue a ferry at his dock and ferry stairs, and to erect ferry houses, &c., on two acres of the land so in controversy, at or near said dock and ferry stairs, and providing that the owners, when the controversy was settled, should sell to Budd the said two acres of land or should pay him for his improvements.

That Budd established and maintained a ferry from the

* *Ante* vol. II, p. 441. † Acts of 1802–3, p. 153.

Bell v. Gough.

dock and ferry stairs built by him from 1802 to 1806, which dock and stairs were within the 53½ acres survey or tract, but were not part of the *locus in quo*, the 53½ acres lying on each side of the ferry dock; that Budd was the ostensible owner of the ferry, which was known as Budd's ferry ; that, after 1806, the ferry was discontinued.

That the legislature of New Jersey, on the 8th day of November, 1836, upon the application of Nathaniel Budd, passed the following act :*

'" An act vesting in Nathaniel Budd all the right and title of the state of New Jersey to a certain tract of land under water in the Hudson river, in the county of Bergen and state of New Jersey.

Whereas it has been represented to the legislature that Nathaniel Budd became seized and possessed of a certain tract of land, containing fifty-three and a half acres, at Horsimus, in the county of Bergen and state of New Jersey, by virtue of a deed from Elisha Boudinot, bearing date January second, eighteen hundred and four, which said tract of land was surveyed to the said Elisha Boudinot, and located, by special order of the proprietors of New Jersey, in front and on each side of the ferry wharf of said Nathaniel Budd at Horsimus aforesaid, and recorded in the surveyor's office at Perth Amboy. And whereas it hath been suggested that the state of New Jersey hath some title thereto, and by reason thereof doubts have arisen concerning the title of said Nathaniel Budd, therefore—

Be it enacted by the Council and General Assembly of this state, and it is hereby enacted by the authority of the same, That, for divers good and valuable considerations thereunto moving, and also for and in consideration of the sum of one dollar to the treasurer of the state of· New Jersey well and truly paid by the said Nathaniel Budd, the receipt whereof is hereby acknowledged, all the right and title of the state of New Jersey to a certain tract of land, situate along the beach on the west side of the North river, or Hudson's river, and running into the same, between Powles hook and Hoboken,

* Pamph. Laws 1836–7, p. 13.

in the county of Bergen, in the state of New Jersey, containing fifty-three acres and fifty-hundredths of an acre, which was conveyed to the said Nathaniel Budd by Elisha Boudinot by deed, dated January second, eighteen hundred and four, as aforesaid, be, and the same hereby are granted and conveyed to the said Nathaniel Budd, his heirs and assigns forever; and that the same shall forever hereafter be vested in the said Nathaniel Budd, his heirs and assigns, in as full and ample a manner as the state of New Jersey hath right and title to convey and grant the same; reserving, however, to the state of New Jersey the full right of jurisdiction and sovereignty in and over the same, as fully and ample, to all intents and purposes, as if this act had not been passed."

That before the date or passage of said act, the title of said premises had been conveyed by Budd to Willis Hall by deed, with full covenants of warranty, seizin, and for quiet enjoyment, dated October 1, 1835, being one of the conveyances through which the defendant claims title.

That the *locus in quo* had been filled in by the plaintiff and reclaimed from the water before the date of the act of 1836, and was enclosed and in grass at the time of the trespass complained of.

That the commissioners, who were appointed by the act of December 7, 1763, to make partition of the common lands of the township of Bergen and to ascertain the boundaries of the patented lands, reported that the aforesaid Kennedy tract, which was in the possession of Robert Kennedy, and was known as the Dutch West India Company's farm, was neither patent nor common lands, and that they did not make partition of the same; that said commissioners, in their field book and maps, (which were part of the case and special verdict) described said Kennedy tract and all other lands lying on the river as bounded "on the Hudson," or "along the Hudson," without specifying whether at low or high water mark, except two lots of patented land enclosed within the general boundaries of the Kennedy tract, which were described by metes and bounds; and then were added the words, "and including all the

lands in front of the same to low water mark in Hudson's river."

That Philip Carteret, the proprietary governor of New Jersey, granted a charter to the inhabitants of the town of Bergen, dated September 22, A. D. 1668, and in said charter described the bounds of said town, as follows :

" *Imprms*. The bounds and limits of the aforesaid towne and corporation of Bergen is to begin at the north end thereof, from a place called Mordanis' meadow, lying upon the west side of Hudson's river, from thence to run upon a N. W. line, by a three rail fence that is now standing, to a place called Espatin, and from thence to a little creek surrounding N. N. W. till it comes into Hackensack river, containing in bredth, from the top of the hill, 1½ miles, or 120 chains ; from thence it runs along the said Hackensack river upon S. S. W. line till it comes to the point or neck of land that is over against Statten island and Shooter's island, in Arthur Cull bay, containing in length about 12 miles ; from thence to run eastward along the river called Kill Van Cull, that parts Staten island and the main, to a point or neck of land called Constable's point or Constable's houck, and from thence to run up northward, all along the bay up into Hudson's river, till it comes to Mordanis' meadow aforesaid ; so that the whole tract of upland and meadow property belonging to the jurisdiction of the said town and corporation of Bergen is bounded at the north end by a tract of land belonging to Captn. Nicho. Verlett and Mr. Samuel Edsall, on the east side by Hudson's river, on the south end by the Kill Van Cull, that parts Staten island and the main, and on the west side by Arthur Cull bay and Hackensack river, as it is more plainer demonstrated by a draught thereof, made by the surveyor general, hereunto annexed ; the whole, both of upland and meadows and waist land, containing, according to the survey, 11,520 acres English measure ; which said limits and bounds, together with all the rivers, ponds, creeks, islands, inlets, bays, fishing, hawking, hunting, and all other appurtenances whatsoever thereunto belonging and appertaining, the half part of golde and silver mines and the royalty of the lords proprietors only excepted,

to continue and remain within the jurisdiction, corporation, or township of the said town of Bergen from the day of the date hereof and for ever, the said corporation submitting themselves to the authority of the lords proprietors and the government of this province—to be holden by them, the said corporation or township, their heirs and successors, as of the manor of East Greenwich, in free and common socage."

And said charter further granted "that all lands and meadows that are appropriated and pattented by particular persons before the day of ye date of these presents shall continue and remain unto them without any alteration, unless the proprietors thereof will give their consent to the contrary." And "that the freeholders living and inhabiting within the said limitts shall be deemed and accompted for freemen of the said corporation," and that "they, or the major part of them, have power to admit of their owne inhabitants and to divide all proportions of land as are within their bounds and limitts aforesaid that are not already appropriated and patented by particular persons before the day of the date hereof, according to their allottments and estates."

That Robert Hunter, the royal governor of New Jersey, on the 14th day of January, 1713–14, being in the 12th year of queen Anne, granted to the freeholders inhabitants of the township of Bergen an additional charter, in the name of the queen, (known as queen Anne's charter) by which the privileges granted by the Carteret charter were confirmed, and in which the bounds of the township were recited in the same manner as in Carteret's charter. This charter also incorporated the trustees, whose election was provided for therein, and authorized them to lease, and sell and convey in fee simple, any of the lands belonging to said community and yet unappropriated; that this charter was confirmed, by an act passed on the 2d day of February, 1713–14, and assented to by Gov. Hunter, July 16, 1714.*

That the trustees of the freeholders inhabitants of the township of Bergen, by deed of bargain and sale, dated February

* The title of this act is printed by *Nevill*, Vol. I, p..467, among the acts disallowed or repealed, but in *Alison*, page 35, it is printed as if in full force.

4, 1804, conveyed to John B. Coles in fee all their right to the Kennedy farm or tract, by the following description : "All their right, title, interest, claim, and demand, either in law or in equity, in and to all and singular the tract or parcel of land called Harsimus, situate in the township of Bergen, in the county of Bergen aforesaid, late in the tenure and occupation of John and Robert Kennedy, esquires, it being the true intent and meaning of these presents to transfer to and invest in the said John B. Coles, his heirs and assigns, all the right, title, and interest which the said trustees had or in any way held in the said tract of land and premises, in virtue of any grant, transfer, or conveyance thereof made to the freeholders inhabitants of Bergen by the Indians, or by Governor Stuyvesant, the Dutch governor, anterior to the surrender of the country by them to the English, or which the said trustees now hold or are in any way entitled to in virtue of the deed or charter of governor Phillip Carteret, bearing date the twenty-second day of September, in the year of our Lord one thousand six hundred and sixty-eight, or in virtue of any other deed, bargain, or contract whatever; and which said tract or parcel of land hereby intended to be conveyed, is butted, bounded, and described as follows, to wit: beginning at a post standing in the bounds or on the line between Powles hook and Harsimus, near the side of the waters of the cove between Powles hook and Harsimus, and from thence to run north seventy degrees fifty-four minutes west, about fifty-two chains, to a stake standing on the northwest side of the road leading from Prior's mills over Harsimus to Powles hook, between upland and meadow, which stake bears to the middle chimney of Nathaniel Budd's house, north sixty degrees fifteen minutes east, also to the north chimney of the house of the widow Vanderhoof, north seventy-two degrees west; thence to run to the waters of the mill creek, otherwise called Harsimus creek, with a course of north thirty-five degrees west; from thence along the said mill creek, the several courses thereof, as it runs to the westerly end of a ditch that was formerly cut to answer the purpose of a fence from said Harsimus creek, to a small creek that runs out of the bay or cove betwixt Har-

simus and Hoboken creek; then along the said ditch to the said small creek; then down along the said creek, as it runs, to the mouth thereof in the said cove betwixt Harsimus and Hoboken; then down along said cove into Hudson river or York bay; then down the said river or bay, as the same runs, till it strikes the division line in the said river betwixt Harsimus and Powles hook; then westerly, along said line, to the place or point of beginning: together with all the rivers, ponds, creeks, inlets, bays, fishing, hawking, hunting, and all other appurtenances whatsoever to the same tract of land and premises hereby released and quit-claimed belonging or in any wise appertaining."

That John Kennedy and Robert Kennedy, by deed dated February 4, 1804, conveyed to John B. Coles in fee such estate, and such estate only, as they had in said tract, describing it as " a certain plantation and tract of land over against the said city of New York, in the county of Bergen, in the state of New Jersey, which said tract of land was taken up by Evan Drummond, on the 25th February, 1724-5 and in the survey thereof is described as follows, to wit: "all that tract of land lying in the township of Bergen upon Hudson's river over against New York, being that tract of land formerly called the West India Company's farm, and now called Harsimus, beginning at the fence at the northwest end of the causeway which leads from Powles hook to Harsimus, and running from thence along the fence, as it now stands, north seventy-nine degrees west, three chains thirty-three links; thence north eighty-seven degrees thirty minutes west, four chains; thence north sixty degrees west, thirty-seven chains, to a small creek in the marsh which runs into the great creek or mill creek; thence, running down the same small creek to the great creek and up the stream of the said great or mill creek, as it runs, to the bridge and causeway that crosses the same, which is nearly sixty-seven chains upon a straight line, and from the same bridge, continuing up the stream of the said great or mill creek, as it runs, fourteen chains and a half, to a small gut that leads into a small creek which falls into Hudson's river; thence along the said gut, north eighty degrees east, three

chains, to a bridge that crosses the gut; thence along the same gut, on the same course, one chain, to the small creek aforesaid, which runs into Hudson's river; thence down the same small creek to Hudson's river; thence down Hudson's river, as it runs, to a fence near the beginning corner, which fence runs from the beginning corner aforesaid, south sixty-three degrees thirty minutes east, ten chains, and thence north thirty-five degrees east, to Hudson's river, which tract of land, within the bounds aforesaid, contains four hundred and three acres strict measure, which, after allowance for highways, is to remain and be for three hundred and eighty-three acres."

That said John B. Coles died January 2, A. D. 1827, having by his will, dated January 11, 1826, duly executed to convey real estate, devised the said tract to John B. Coles, Isaac U. Coles, and William F. Coles, who leased the *locus in quo* to the plaintiff; and that the plaintiff occupied the same, by virtue of said lease, at the time of the trespass complained of.

Argued by *Zabriskie* and *Vroom*, for plaintiff in error, and *Dayton* and *Whitehead*, for defendant in error.

*Zabriskie*, for plaintiff in error.

This action is the ordinary action of *trespass quare clausum fregit*, in which the defendant pleads title, and, therefore, the question to be argued and decided is, do the facts found in the special verdict show a legal title to the *locus in quo* in the plaintiff.

By the verdict, the trespass was committed on land which had been filled in between high and low water mark, situate in front of lands owned by the defendant, or those under whom he claims, and within the bounds of the survey to Boudinot of the 53½ acre tract, which is claimed by the plaintiff by virtue of that survey and the act of 1836, and was filled in before the passage of the act of 1836.

The plaintiff must now show positively title in herself. She does this from three sources : 1. Possessory ; 2. Proprietary ; 3. Legislative.

1. Possessory.  Her father, Nathaniel Budd, under whom she claims, and whose title she has, from 1802 to 1806 pos-

sessed and built a dock and ferry stairs on the shore adjoining Coles' tract or the Kennedy tract. While in the possession of this, he bought the Boudinot survey of the 53½ acres on the shore and under water on both sides of his tract; this *pedis possessio* of part, under a documentary title supposed to be good for the whole, gave him legal possession of the whole.

The act of the legislature and the facts in the verdict show that his dock and ferry stairs were not on the Kennedy tract, but on lands adjoining claimed by him, and not by them. The object of the act of 1804 was to get a legislative lease for two acres adjoining his dock, which were in dispute, with a right to purchase or to receive pay for his buildings on the two acres: for his ferry and stairs no such right was asked.

2. Proprietary title. The title to all New Jersey was granted by the English sovereign to Berkely and Carteret, and their title is in the proprietors. Carteret's charter, of 1668, granted to the inhabitants of Bergen all *the land* in the limits of the description in it. This, I will afterwards show, extended only to high water mark. The shore and soil under water were supposed, until the decisions in *Arnold* v. *Mundy*, in 1821, and *Martin* v. *Waddell*, in 1842, to remain in the proprietors. If these decisions, holding that this title is not in the proprietors only, affect the soil in the bed of the river, and not the shore, then the proprietary title of the plaintiff is good to the *locus in quo;* but if they extend to the shore as well as the river bed, which is perhaps the better opinion, then her proprietary title will not avail her.

This title under the Boudinot survey was got by Budd, January 2, 1804, before the deeds to Coles from the Kennedys and the trustees of Bergen, which were executed when Budd was in actual possession under this title, running his ferry.

3. Legislative title under the act of November 8, 1836.

Budd having built his dock and procured the proprietary title, Coles, in 1836, filled in the *locus in quo*. Budd forbade him, and doubts arising about that time as to the title of the proprietors, Budd procured the act in question. It granted the 53½ acre tract, and all the title of the state in it.

If the state owned all land below high water mark, then

this act conveyed good title, unless Coles' act of taking possession, in 1836, placed some constitutional barrier against the grant of the sovereign power of the state. The sovereign law making power in New Jersey has absolute authority over every thing within the limits of the state, unless restrained by constitutional restrictions or vested rights of property.

This act *prima facie* establishes the title of the plaintiff, and now the burthen of proof is shifted on the defendant, to show that the right was vested in him, and not in the state, and was beyond its power to grant.

This brings us to the title of the defendant. He claims under John Coles, and all the title that Coles had, he has.

Coles' title is derived from two sources.

1. The deed of John and Robert Kennedy to him, dated February 4, 1804.

2. The deed from the trustees of Bergen, of the same date.

Both are quit-claim deeds, carefully drawn so as to exclude all warranty of title.

Of the Kennedy title there is no proof, except the recital of *possession* in the field book of the Bergen partition; but of the *locus in quo* there is no pretence of possession until 1836.

The title under the deed from the trustees is that derived from the charter of Governor Carteret in 1668. This charter describes the bounds of the township, and grants to the inhabitants the unappropriated lands within those bounds. If these bounds do not include them, the trustees had no title, and could not convey lands under water.

The bounds there given begin at Mordanis' meadow on the west side of the Hudson river; thence over to the Hackensack, and along the Hackensack and Arthur Cull bay and Kill Van Cull to Constable's hook; " thence to run up *northward*, all *along* the bay, *up into* Hudson's river, until it comes to Mordanis' meadow aforesaid "—the word " into " here means *entering* the river. No one would read the words *along* the bay to mean in *the middle* of the bay, or any thing else except along the shore of the bay: if you trace the shore of the bay on the map, you will find the mouth of the Hudson distinctly defined by Jersey City on one side and the southern

point of New York on the other; and when tracing the shore *up northward* we arrive here, no more appropriate expression could be used to carry us along the shore of the Hudson than to say *up into* Hudson's river. It is not *out into*, which would be necessary to lead us to the middle of the river, as contended for on the other side; and the course along the shore is the only one that will take up to the place of beginning, Mordanis' meadow, on the west side of the Hudson. The grant bounds it east by Hudson's river, not the *middle* of the river. It describes "the whole, upland, meadows, and waist land, containing 11,520 acres," saying nothing of lands under water.

This charter evidently never intended to grant any thing except the lands within the shores: carrying it to the middle of the river would increase the quantity of land by several thousand acres. The language used by the commissioners in the partition field book, in describing the bounds of the township, show that such was their understanding.

Inspect their book any where, either in the description of patent lands or of their allotments of common lands, and wherever there is any guide, it always shows that they went no farther than high water mark: their calls for beginning points along the bay or river are for trees or stakes standing in the bank, or other objects that *could* not have been below high water mark. See patents 14, 20, 19, 24, 26, 28, 29, and allotment 172. Two lots only, patents 4 and 7, for some reason, perhaps the express grant in the original Dutch patent granted by government, are carried to low water. This carefully expressed exception proves the rule.

The charter of Carteret to the town of Bergen, in 1668, was in part a grant of political or municipal powers, and in part a grant of lands, both being in some measure in confirmation of grants by the Dutch governors or directors general, in accordance with the terms of surrender by Governor Stuyvesant, and, to understand it, a brief reference to a few historical facts and dates will be useful.

The Dutch, who, by Hudson, first discovered this country, September 12, 1609, began some settlements in 1614, and incorporated the Dutch West India Company, June 23, 1621, a

636 COURT OF ERRORS AND APPEALS.

mercantile trading company, with full powers of government. They appointed their own governors, who were commissioned by the states general. This company settled New York and the township of Bergen, and their governors granted patents for much of the land in Bergen township.

In 1663–4, March 12, Charles II. granted a tract including it by patent to the Duke of York. *Leam. & Spi.* 3.

June 24, 1664, the duke granted New Jersey to Berkely and Carteret. *Ib.* 8.

August 27, 1664, the Dutch surrendered to Governor Nicholls, with stipulations for protection of all rights of property. *Smith's Hist. of N. J.* 43.

In 1668, September 22, Carteret granted the charter to the town of Bergen, granting certain municipal powers, and confirming patents and grants of unappropriated lands to the freeholders.

In 1672, (*L. & S.* 50) New York was reconquered by the Dutch, and New Jersey submitted to them, and upon treaty of peace being made, February 6, 1674, (*Ib.* 50) between England and Holland, the Dutch possessions were again surrendered.

After this, June 13, 1674, (*L. & S.* 49) Charles II. confirms East Jersey to Sir G. Carteret; and June 29, 1674, (*Ib.* 41) grants a new patent to the Duke of York, who, July 28, 1674, regrants East Jersey to Carteret; and Carteret, December 6, 1672, (*Ib.* 35) confirms all grants made by him, or his authority, before July 28, 1672. New Jersey having been divided by the quintipartite deed, dated July 1, 1676, (*Ib.* 61) the Duke of York, by deed dated March 14, 1683, (*Ib.* 141) and Charles II., by deed dated November 23, 1683, (*Ib.* 151) confirmed East Jersey to the twenty-four proprietors; and in 1702, April 15, (*Ib.* 609) the proprietors surrendered to queen Anne all powers of government and regalia.

Thus the charter of Carteret was confirmed, and the grants of land under it; but with the surrender in 1702 all the regalia or rights of government passed to the queen, and left the Bergen freeholders only their rights of property and their municipal charter, if they had ever had any thing more.

After this surrender in 1713, by queen Anne's charter, the trustees were incorporated, and were authorized to convey the common lands of the freeholders.

Their power was limited—1. By Carteret's charter conveying only to the shore or high water mark.

2. By the surrender in 1702, by which the regalia, including all below high water mark, were surrendered to the crown, these regalia having until then remained with the proprietary government.

But these deeds did not convey any thing below high water mark, nor were the descriptions intended to include it; according to all ordinary understanding of the terms, the description in them hugs the shore. The description in the Kennedy deed is so plain that it requires no comment, and this description is in the words of the location to Archibald Kennedy in 1735, which is recited in it. The deed of the trustees says it is for the Kennedy tract, and therefore cannot extend beyond it. But here the description "down along the cove *into* the river" means in surveyors' language, according to the testimony of Andrew Clerk, a most experienced surveyor, to where the cove runs *into* the river; and then "down along said river or bay, as the same runs," can mean nothing, as to the bay at least into which this cove debouches, except along the shore as it runs. This court will notice that the cove mentioned is not the bay or cove between Paulus hook and Hoboken, but the little cove "between Horsimus and Hoboken creeks," which opens into the larger cove or the bay between Hoboken and Powles hook.

But on the *effect* of these conveyances, without regard to the description, two questions are raised.

1. Do these deeds and this patent, by conveying *to* the shore, give title below high water mark?

2. If not, did they or any rule of law confer the *right of appropriating* the shore below high water mark by filling it in?

The first question the judges of the Supreme Court unanimously answer in the negative; all agree that *title* by the common law and the law of New Jersey is bounded by high

water line; all the authorities agree.  4 *Burr.* 2164; 1 *Halst.* 67; 1 *Zab.* 162; 6 *Cowen* 518, 528; 6 *Mass.* 436.

To the second, each gives a different answer, abandoning a *settled rule* of law for vague traditions and more vague judicial discretion.  Two of the judges attempt to establish a new rule, and each lays down a different rule, according to the traditions of the locality in which it has been conceived.

On the first argument, 1 *Zab.* 156, all concurred with Justice Randolph that plaintiff could not recover.  Justice Randolph still adheres to the rule of common law, that all below high water mark belongs to the state.

The Chief Justice holds that, by a peculiar local law, the shore owner may fill in, if *suffered* by the state, to low water mark, and will thus extend his title to actual high water mark, as made by himself.

Justice Carpenter holds that the shore owner in New Jersey has a right to fill in and appropriate not only to low water mark, but beyond it, if he does not interfere with navigation.

Our first proposition is, that in navigable rivers, where the tide ebbs and flows, the soil under the rivers belongs to the state or sovereign, and does not pass by a grant of property to, "along," or " bounded by," the river.

Secondly, that this right of the state or sovereign extends over the *shore* or the space between high and low water mark.

All elementary writers and all decided cases maintain these as the rules of the common law.  *Hale de jure maris ; Har. L. Tr.* 12, 13 ; *Com. Dig., Navigation A. B. ;* 3 *Kent's Com.* 427, 431; *Angell on Tide Waters* 17, 20, 66, 76, 22, 23, 45, 207; *Case of the River Banne, Davies' R.* 149 ; *Blundell* v. *Catterel,* 5 *Barn. & Ald.* 278, in which Justices Bailey, Best, and Holroyd all agree in these propositions.

In *East Haven* v. *Hemingway,* 7 *Conn.* 186, the grants were expressly, what the other side contend their grants are by construction.  The crown granted to the town a tract, expressly including the *locus in quo* below high water mark, and the town had granted from high water mark to channel to build dock; and it was held not to convey title, though grant to town contained all rivers.  See p. 198, 199.  And

in *Chapman* v. *Kimball*, 9 *Conn.* 38, the same doctrine is maintained.

The same doctrine is established in Pennsylvania; it is the doctrine expressly laid down in most of the cases in that state, though there are some cases and *dicta* that seem to lay down a different rule.

In *Commonwealth* v. *Fisher*, 1 *Penn. Rep.* 462, it is laid down that the state owns all below high water mark. In *Ball* v. *Slack*, 2 *Whart.* 539, the court agree with and accept the doctrine of Sir Matthew Hale. The *dictum* there, as to the right of wharfing out, is plainly based on a misunderstanding of the facts in the case of *Blundell* v. *Catterel*, an error which others have fallen into. In that case it was held that the plaintiff did own *the shore;* but this ownership, found by the special verdict, Holroyd, J., supposes to rest on some ancient grant before the statute of *quia emptores*, and was in derogation of the common right. And it was also found that the defendant (or his master) owned the land to high water mark; so that the decision for the plaintiff establishes just the reverse, that is, that the defendant, although riparian owner, had no right upon *the shore* when the shore, by some ancient grant or prescription, was the private property of another. In *Shunk* v. *Schuylkill Navigation Co.*, 14 *S. & R.* 81, in which the history of the origin of the right of fishery in the shore owner is gone into at large, the court lay down that the riparian owner has no *title* in the shore, except to use it for a landing place, and was entitled to no damages on its appropriation.

In *Commonwealth* v. *Shaw*, 14 *S. & R.* 1, and *Nagles* v. *Ingersoll*, 7 *Barr.*, the *dicta* of the judges seem to favor a different doctrine.

In Massachusetts, the common law doctrine, as laid down by Lord Hale, is recognized, except so far as the same was changed by the ordinance of 1641, which gave the adjoining owner a right to the shore, if not more than one hundred rods. Beyond this the common law still prevails in Massachusetts. 6 *Mass.* 435, *Storer* v. *Freeman;* 19 *Pick.* 191, *Sale* v. *Pratt;* *Commonwealth* v. *Wright*, in *Angell on Tide Waters* 207.

The courts of New York have fully recognized and esta-

blished the common law rule. 2 *Johns.* 356, *Cortleyou* v. *Van Brunt.*

In Ohio, the rule we contend for is recognized to be the principle of the common law, as applied to them. 11 *Ohio Rep.* 138, *Blanchard* v. *Porter.*

The decisions in New Jersey have heretofore recognized the common law rule, that lands along the shore are bounded by high water mark. In *Arnold* v. *Mundy,* 1 *Halst.* 1, one of the best considered and best argued cases in New Jersey, this is laid down to be the rule in New Jersey. It was then established against the prevalent opinion among the people and many of the bar, and against the first impressions at the circuit of C. J. Kirkpatrick himself. Since then the law has been esteemed settled in New Jersey, until the opinions of the Chief Justice and Justice Carpenter in this case developed the extraordinary novel and original positions taken by them.

On the first argument of this cause, reported in 1 *Zab.* 156, Justice Randolph delivered the able opinion, in which all the court concurred, holding that the plaintiff's was only to high water mark.

The Supreme Court of the United States have adjudged such to be the doctrine of the common law applicable to this state, and to be the law of New Jersey.

In *Martin et al.* v. *Waddell's Lessee,* 16 *Peters* 369, the question decided was as to the soil under water in the bed of the river, but the language and reasoning of the court applies the same doctrine to the shore. *Pollard's Lessee* v. *Hagan,* 3 *Howard* 212, and *Handley's Lessee* v. *Anthony,* 5 *Wheat.* 376, affirm the same doctrine.

In this very case the Chief Justice holds, 2 *Zab.* 455, that, by the common law and the law of this state, high water mark is the boundary of the title of the riparian owner. Justice Carpenter, p. 472, admits that it is the common law doctrine, " long well settled."

All admit the power of the state to grant this right to the soil, if not already vested in some one else. There is no restriction in the federal constitution or in the constitution of New Jersey; and except so far as restrained by constitutional

limits, the state is sovereign and its power unlimited : it can appropriate any thing within its limits. This power was recognised in *Martin* v. *Waddell's Lessee,* where the title of plaintiffs in error to the lands under water was derived from the state.

All agree that the king's grant or Duke of York's grant did not pass property below high water mark, and the trustees therefore *could not* grant what *could not* have been granted to them ; that all regalia, and every thing but rights of property, passed by the surrender in 1702 to the crown, and by the Revolution to the state ; and then the state could pass the title to these subaqueous lands by the act of 1836.

But the two judges, who ruled this case below, to carry it out of the clear and settled rules of the common law, devise or imagine a *custom* or *understanding,* local in New Jersey, changing the rule of the common law. They do not rely upon any statute, there is no statute ; nor upon any decision of the courts, for the decisions are rather the other way, but upon a silent unspoken understanding of the bar, a misconception or ignorance of the rule of the common law indulged in so long that the law had quietly, by reason thereof, changed to suit this misconception, instead of the ignorance of the bar rising, by being enlightened, to a knowledge of the common law. One judge makes it *a right* to seize peaceably, the other ripens it into title.

The Chief Justice, after admitting the rule of the common law, to sustain his idea of a " local common law " in New Jersey, refers to the fisheries in the Delaware river. There is no doubt but that these fisheries, by a series of laws, founded perhaps upon a prevalent mistake, fallen into by the bar, that the riparian owner owned to the middle of the river, or perhaps upon some ancient ordinance or statute, or proprietary concession, had become vested in the owners of the adjoining land, if not as an estate, at least they were protected in the exclusive enjoyment of them. They alone are allowed to draw their seines upon the bank, and the statutes forbid any one else from fishing in the river in front of their lands.

But during all this time the statutes relative to East Jersey

permit all to set up poles and nets, subject to certain restrictions. The practice, as I understand, always has been, and now is in East Jersey, for any one to set his poles without regard to the shore owner, and only regarding certain rules of curtesy among the fishermen themselves. ·

We have the opinion of Richard Stockton, as to what he considered the rule in East Jersey, as to the ownership of shore in 1802, in his certificate to Budd's petition. He was the counsel of Kennedys, and certified, as *their* counsel when Budd claimed the dock and- ferry stairs as *his own*, and applied for privilege to occupy two acres of Kennedy's lands adjoining, that he saw nothing improper in the application.

From this local custom or right, established by statute in West Jersey against the common law and local law in East Jersey, the corrollary is drawn, that a local law as to docking out prevails, which extends over East Jersey; and the Chief Justice says, p. 467, that docks were built without special law until Arnold and Mundy, in 1819, and that he finds no special act until 1839. The plain and true answer to this is, that this practice was caused by the mistake in the law as to the boundary of lands upon tide, in which in the same paragraph, it is admitted that Kirkpatrick and Griffith fell : if any one supposed that he owned the shore and land under water in front of him, he would not apply for a law to permit him to build on it.

In 1819 and 1838 the people and the profession were taught what was the law of boundaries on tide water, and then they relied upon no custom, but applied for special acts, p. 468. "These opinions are overruled, but show the prevalent view of the profession."

In this case no local usage is found, and we earnestly contend that the facts in the private knowledge of the Chief Justice and Justice Carpenter are not true, as applied to East Jersey.

The people in most parts of New Jersey, and no doubt many of the profession, were for a long time mistaken as to the necessity of maintaining a road fence and as to the ownership of the soil under highways; and a custom, a "local cus-

tom," had sprung up, and was tolerably well established, of pasturing cattle upon the road; but when, a few years since, the decision of *Chambers* v. *Matthews* settled the point, that no fence was required as against cattle pasturing on the road, and that the soil under the highway belonged to the adjacent owner, the practice growing out of the mistake or ignorance of the law was corrected, and no one would now pretend that the usage of years and a long misapprehension as to the right had ripened into an established custom.

This usage, as to the use of, and wharfing out on the sea shore, no doubt existed in England and in New York, yet it did not abolish the rule of the common law.

In Massachusetts and Maine it was founded on the ordinance of 1641, and in Rhode Island it is supposed to be by virtue of on old ordinance.

If the rule of the common law is found not to be suitable to this state or the wishes of the people, it should be altered by the legislature, not by the courts; statute made law is more desirable than judge made law. And the act of March 18, 1851, (*Pamph. L.* 335) passed since the decision below, has made the question only important in this case; and to reach this case it is hardly advisable that this court should set aside the rules of the common law, heretofore held by the courts of New Jersey and the Supreme Court of the United States to be the law of New Jersey.

In this case the equity and hardship is on the side of the plaintiff, the want of equity on the other side.

Budd erected his wharf, in 1802, by Kennedy's consent; he bought Boudinot's title, when it was thought to be good, openly, with knowledge of Kennedy and Coles. In face of this, they *squat* upon the *locus in quo* in 1836, and fill it in, knowing it was not their own, but either Budd's or belonging to the state.

As to fraud in obtaining the act of 1836 or of 1802, it seems to me that it cannot be inquired into collaterally; there is no notice of it, no opportunity of defence. Inference that there must have been a misapprehension in the legislature, drawn by a court from the language of an act, might be rebutted by the petition or the oath of the members, if living.

Few acts, public or private, would long stand the test if judges were to set them aside upon the inference, from the injustice or unreasonableness of their provisions, that there must have been fraud in procuring their passage.

Here the only *data* from which fraud can be inferred are the act and the preamble. Admitting that a hurried perusal of · the preamble of the act of 1836 might leave the impression on a dull mind that the tract in question was *then* adjoining Budd's dock and ferry stairs, yet a reperusal of it makes it as clear as can be that it only recites that the tract, when granted by Boudinot, was adjoining the dock and ferry stairs of Budd, which was strictly true. It did not recite that it was in front of Coles' land; but it must have been in front of somebody's land, and he did not pretend it was his own, and the act of 1802 plainly recited that his dock and ferry stairs were in front of Kennedy's tract; the truth and the whole truth appears on the face of the act. The representatives from the county no doubt knew the situation of these lands at the passage of both acts, and the supposition is that they fairly and truly represented it to the legis- · lature. If it was in evidence that the facts were fairly and truly stated at the passage of the act, could this court disregard this act upon this ground ?

If, then, by the law of New Jersey the title to the shore and land under water is not vested in the adjoining owner, but is in the state, and the state, by its legislature, sovereign in power and unfettered on this point by any constitutional provision, by a valid law granted the title to Budd in 1836, it is in the defendant, Mary Bell; she has maintained her plea, and is entitled to judgment.

*Dayton.* The trespass complained of was for entering upon lands between high and low water, and cutting grasses, clover, and red-top, as appears by the evidence, which must have been sown there after the land was reclaimed.

The defendant below pleaded title, and attempts to prove it—

1. Through a survey to Elisha Boudinot, 21 March, 1803, and a deed to Nathaniel Budd, January 2, 1804, with mesne conveyance down to herself.

2. Through an act of the legislature of New Jersey, November 8, 1836, vesting in Budd, under whom she claims, the right of the state.

Her first source of title is readily disposed of.

The proprietary rights do not extend to the beds of our navigable rivers. This I take to be a settled principle in the jurisprudence of New Jersey. It has been settled, upon full consideration, in the cases of *Arnold* v. *Mundy* and *Martin* v. *Waddell.*

Those cases, however, it is to be remembered, were for the *bed* of the river *strictly,* and not for the *shore* or soil between ordinary high and low water.

In *Arnold* v. *Mundy* (p. 20) the oyster beds were said to be bare only at *very* low tides, and were below *ordinary* low water ; and in *Martin* v. *Waddell* the premises were found to lie beneath the waters of Raritan river and bay. In both cases the subject matter of suit were oyster beds, which, in their nature, must be below *ordinary* low water.

The second argument of this case brought up the question as to the right of the riparian owner to the shore in front of his lands, for the first time in New Jersey. The remarks of Chief Justice Kirkpatrick, in *Arnold* v. *Mundy,* and of Justice Randolph, on a former argument of this case, where the precise *locus in quo* was not fixed, were mere *obiter dicta.*

If the proprietors, however, had the right of soil to *low* water, it is obvious that the defendant could take nothing under the survey to Boudinot, because the plaintiff held a title from the proprietors long prior to such survey.

The plaintiff's title dates back to 1668, while the defendant's, under the survey, is in 1803 only. It is manifest, therefore, that the defendant's claim through the proprietors is worthless.

The only remaining source of title is the act of the legislature, November 8, 1836.

This act, I contend, gave no title, because—

1. It appears *upon its face* to have been obtained by *fraud* and *misrepresentation.*

2. The land, at the *date* of the act, was *not covered by water,* and is not embraced within its terms and description.

3. The state had no title to this land at the date of the act, whether it be regarded as a river bed or reclaimed land.

The Coles had been in the notorious possession of these lands; had built wharves, docks, and reclaimed these flats at vast expense. Budd himself had been a tenant of part of these lands under the Coles title.

Yet Budd represents to the legislature, as appears by the *preamble* and *title* of the act in question—

1. That he was " seized and possessed of 53½ acres," when, in fact, he was not seized and possessed of one foot of the 53½ acres.

2. That they were *" conveyed "* to him by Boudinot, when, in fact, Boudinot had nothing to convey.

3. That they lie on the " front and each side of the ferry wharf of Nathaniel Budd." In fact Budd had no wharf there in 1836 ; it had disappeared long before that.

4. That it was land *" in the Hudson river, and covered with water."*

This was a most gross misstatement of the *then* existing fact, as the lands had been reclaimed, and were *not in* the river or *covered with water* at the date of the act.

The whole was a gross palpable deception practiced on the legislature, who thought they were securing a shore owner only in a doubtful title to lands in front of him.

This act, as respects these parties, was a *private act,* passed without notice, and, as appears by the minutes of the legislative council, pages 15, 16, and 32, and of the assembly, pages 96, 97, 99, and 103, with great speed. It is tainted with fraud, both " *suppressio veri,*" and " *suggestio falsi.*"

Is there no remedy ? Judge Randolph says, not in this way ; but he does not say in what way. I contend that this is the true, if not the *only* way we can get at it. If *void for fraud,* it must be void everywhere. Equity has no power on this question that law has not.

The legislature, I submit, cannot repeal it; it is a contract. The statutes provide modes of testing the right to an *office* or *franchise,* but none in a case like this. Here is a *grant,* a question of title, and the state is the grantor. The judiciary is

the true, if not the only tribunal under our system and institutions for determining such a question. The general doctrine will be found in the cases cited. 5 *Cruise's Dig.* 53, § 37, 38, 39, 40, 107. See 10 *Coke* 109, *Legat's case;* 6 *Ib.* 29, *Green's case;* 4 *Harr. Dig.* 2497; 5 *Wheat.* 293, *Polk's Lessee* v. *Wendall;* 9 *Peters* 668, 670–9, *Winn et al.* v. *Patterson;* 10 *Price* 412, *Parmenter* v. *Gibbs;* 2 *Rolle Abr.* 191, § *pl.* 2; 2 *Hilliard's Abr.* 263–5–6; 3 *Harr.* 74, *Obert* v. *Hamill;* 6 *Halst.* 392, *Den* v. *McKnight;* 2 *Bl. Com.* 352.

The cases, on a careful examination, show that if the sovereign power be deceived and defrauded in its grant, it is not necessary to test the question on *scire facias.* That the grant, being *absolutely void,* may be tested on ejectment or in any other way that the question shall come directly up.

I have found no case in this country where the question has come up in any other way. A *ready* mode of raising the question of fraud is vastly important under our system of legislation, where private acts are so easily obtained, acts which otherwise conclude a man's rights unheard.

But if the act be valid at all, what does it cover? Clearly nothing but what is embraced *within the description and intent* of the act.

Its nominal bounds go around our wharves and long dock as well as all this reclaimed land ; but it is not contended that the docks passed.

The title, preamble, and body of the act purport to convey lands *under* water in the Hudson river, and such only are within its spirit and meaning. These lands were *above* water, and are not embraced.

The king's grant must be strictly construed, and especially should it be so where it is without consideration. 5 *Cruise* 49, § 25; 13 *Peters* 701; *Vin.* 155, § 3, 7, 130.

If general words are used, they do not pass royalties ; and, *e converso,* royalties being conveyed, nothing passes which is or has become *private* estate. That is the case here. If the land be regarded as the bed of a navigable river, it is a royalty only, and nothing which is not strictly such will pass by the words of the act.

3. But if we be wrong in all this, another question arises.

At the date of this act (1836) the state had no title in these lands to grant.

The plaintiff below held, in the first place, a prior title, both from the colonial government and the board of proprietors—the title of the town of Bergen and of the Kennedys.

The governor and council of the proprietary government had entire power over both the royalties and private estate. They constituted not the owners of the land only, but the then state or sovereignty under the *grants* and *concessions*. *Leaming & Spicer* 19, § 7; *Ib.* 23, § 1 and 2; *Ib.* 33, § 3; *Ib.* 34, § 4.

The patent to the trustees of Bergen was confirmed by act of assembly at Burlington, 2d February, 1713, and assented to by Governor Hunter, 16th July, 1713.

See likewise the act 12 Anne, folio 75, of New Jersey acts, in the state paper office at London, and the return to the commission to London, issued on this case.

The charter of the town of Bergen, and subsequent confirmation speak of Bergen as an ancient town, accustomed to exercise divers privileges and *jurisdictions*. In the charter, *commerce* and *customs* are expressly provided for. Its water rights and privileges were of the utmost importance, as it lay along the Hudson, opposite to the great commercial mart of the colonies, even at that day.

The protection of its shores, erection of wharves, piers, &c., were absolutely essential. New York and New Jersey were then under one proprietary governor, and on each side the shores, as appears by cotemporaneous history and facts, were constantly improved.

In view of this state of things, the bounds of the patent are peculiar. It calls for a line "along the river ⸬ill Van Cull" to Constable's point; thence up "all along the bay up *into* Hudson's river," together with the *rivers*, &c., "the half part of the golde and silver mynes, and the royalties of the lords proprietors only excepted."

The line ran not to out *into* the river, and the conveyance was of half of the gold and silver mines and royalties. The word *one half* applies to the word royalties as well as to gold

and silver mines, for the latter were royalties at that day. The reservation of the half to the proprietors shows what was intended to pass to grantees. The patent obviously intended to convey more than the mere soil. It was the establishment, as appears on its face, of a community, with authority to govern its public affairs, elect magistrates, enforce its laws, and it expressly provided for freedom of worship and conscience, as well as for modes of taxation.

The very object of this charter to a public town along a public river would have been disappointed if limited to high water mark and not giving a right going *into* the river.

The trustees' deed to the Coles, 4th February, 1804, is an early recognition of this construction; though starting and ending at a different point and with different bounds, it uses the same language, and runs the line *into* Hudson's river.

Besides, if you run the line *along* the edge of the river, as is contended for, you *omit two entire courses* of the deed, and make the last course westerly, and not southerly, as the deed calls for. The language of the deed is clear; it calls for a course *down* the cove *into* the river, not in another direction down the side, or along the river. Justice Randolph says that this language must be limited to the shore only, because the grant was to be subject to the lords proprietors, who, he assumes, held to the shore only. But this is a mistake, the grant was in 1668, and long before the surrender. At that date the lords proprietors held both the government or royalties and the private estate, and they did surrender half the mines and royalties: yet all this was to be subject to the jurisdiction of the proprietors.

The objects of the conveyance to this public town, the terms used, the repetition of those terms in the trustees' deed, the fact that two small patents (No's 3 and 4) in the division of the common lands of Bergen, as shown on the field book, call for low water mark, all seem to imply that the intent was, and by these papers it is so recognised, to carry the line of the town of Bergen below high water mark and *into* the river. If so, the right to the bed of the river was parted with before

the surrender in 1702, and vested in those under whom the plaintiff below makes title.

But if we be wrong in all this, a still more important question, as a question of *principle*, remains.

How far does the right of a riparian owner in New Jersey extend? I contend that our *local common law* carries him to low water wark, subject, of course, to the *jus publicum*. I contend that the common law of England on this subject, in its strictness, never has been applied in this state.

By that law, no dock could be built by a riparian owner below high water without license from the king; he could not use his own shore for a fishery, or even the collecting of sea weed, to the exclusion of another.

When the constitution of New Jersey was adopted, we adopted so much of the common law of England only as had theretofore been practised in the province. (Article 22.) But this part of the common law had not been theretofore practised. The entire history of the state and its improvements along its watercourses every where were directly opposed to it.

The original grant to Berkely and Carteret bounds New Jersey, "on the east part, by the main sea and part by Hudson river, and hath upon the west Delaware bay or river." *L. & S.* 10.

We thus have a water boundary on both sides, and our state is every where pierced by navigable streams. There is ample room, therefore, to learn what our local common law has been and is.

These improvements, coeval with the settlement of the province, are every where, and always without authority of statute law.

The sense of the profession, too, as to the custom of the province in regard to improvements between high and low water, has been uniform. The admissions of counsel, in *Bennet* v. *Boggs*, 1 *Bald. R.* 65, 66, 68, the statement of Chief Justice Kirkpatrick, in his charge at the circuit, in *Arnold* v. *Mundy*, the old opinions of Mr. William Griffith, of Mr. McWhorter, of Mr. Frelinghuysen, here presented to the court,

(all counsel of large experience) concur in the statement, that such improvements have been the practice of the state upon the part of the shore owner; and such, too, is the evidence in the cause, as well as the records in the surveyor general's office of both East and West Jersey; wherever a survey calls for a water line it is always the low water line.

On the Delaware, the right of the shore owner goes to low water, as is admitted (1 *Bald R.* 65), why not on the Hudson? Why one law for the east and another for the west?

The reasoning of Judge Randolph upon this point, as is respectfully insisted, is fallacious. True New Jersey was granted by James Duke of York out of a larger grant, and the balance remained to the grantor. Pennsylvania was granted to Penn, but it was bounded on the east by the Delaware, and included no part of the river; that remained, too, in the crown. There is no reason in this why the shore owner should go to low water on the Delaware, and not on the Hudson. But a complete answer to the judge's suggestion is found in the fact, that the same system of improvements and admitted right to low water on the shore exist along the other tide waters of West Jersey, where Pennsylvania can have no claim, as upon the Rancocas, Salem creek, and others.

The state has always recognized the right of fishery in the shore owners, both in the east and west, and protected them. See *Rev. L.* 596, as to Hackensack and others. So, too, she has expressly recognized the ownership of flats. *Rev. L.* 494–5, § 11, 14, and others. These rights had been exercised without doubt or molestation till Judge Randolph's opinion. At the next session of the legislature ten special acts were applied for; and then came a *general* law authorizing these improvements, which stopped the alarm. See *Pamph. L.* 1851, 498, 335.

Can it be said, in view of these general matters, that this state has ever adopted in practice the English common law limiting the shore owner strictly to high water mark?

But the legislative and other history of these lands now in controversy and the shore adjoining is full of further instruction on this point.

1. In the division of the common lands of Bergen are the

two small surveys *near* the water's edge; these call *for low water;* and this division was subsequently confirmed by legislative enactments. Of those which were bounded *on* the water nothing is said; they went to low water of course.

2. The Jersey associates, under a mere right to dock, have been engaged, since 1804, in reclaiming the flats, and, as the evidence now shows, nearly one half of all Jersey City is below the old high water mark! and if the defendant's position be sound, it belongs to the state.

3. The plaintiffs, or those under whom they hold, have had the public use of this very land since 1796.

Budd lived there under Kennedy in 1802, and had a dock 800 feet long. The act of 22d November, 1802, recognizes its ownership, though built without special law. In 1805 or 6, Jarvis, under the same title, built a dock between 800 and 900 feet long, and the Coles, in 1814 or 1815, built long dock, 80 feet wide by 1200 or 1300 feet long, with an L at its end, some 12 feet wide, and reaching 200 or 300 feet up the river.

In 1836, this immense dock was rebuilt of stone, and much of the land along side of it was reclaimed by filling in from the upland. Thus, from 1798, there has been a constant and public use of these lands by the shore owner, between high and low water, without special law, yet without the slightest question. Can there be stronger proof of what was held to be the rights of the shore owner?

Sound policy requires that we uphold this system. None other can succeed in a new country, though in an old one, poorly watered, it may be otherwise. Here are vast quantities of land to be reclaimed from the waters and marshes, and none but the shore owner has the same interest to reclaim them. Every acre reclaimed enters into the aggregate value of state property, and is subject to general taxation.

All our vast improvements in the way of docks, wharves, &c., have been heretofore recognized as property of the shore owner by the state's imposing tax for the value against such owner.

No sudden outbreak against the common law is asked; we seek only the same modification which has been adopted in at

least nine of our sister states. Of the thousands of improvements below high water in this entire land, (drained, as it every where is, by rivers and creeks,) I ask for one case where there has been a recovery by a state or its alienee. Even in England the rule of the common law cannot, in this respect, be in practice strictly applied. McCauley, in his late work, tells us that one-fourth of all England has been reclaimed since Charles II., much by enclosure acts; but it is obvious that much of such a proportion must have been done without any act at all.

We protest against the application of this principle of the common law here; it is wholly unfitted to the wants and condition of our country.

But again, the plea in this case justifies the trespass *up to high water mark*, as it was *at the time of the filling in*. The defendant cut up to that line *as it then* was. This *must* have been higher than natural high water mark.

The corporation of New York has extended the city wharves opposite some 400 feet into the river, and every year it is on the increase. See *Report of legislative committee, January* 25, 1849, pages 22, 23. They have thus pushed the waters farther up on our flat shore. To this extent at least, even at common law, we could reclaim.. See *Rex* v. *Pegram*, 8 *B. & C.* 355. To that extent their justification, in any event, is worthless.

Again, if the state can grant the bed of a river, can it do so after it is no longer a river bed? When reclaimed, does it not cease to be regalia? The case is not now on indictment for nuisance or purpresture. Between us and the state there may be a question; but the state never conveyed that right or remedy, whatever it is, to a private grantee. Wherever the regalia is changed the right of the king is gone. *Schult. Aq. R.* 17. It is so of waifs, royal mines, treasure trove, and wrecks.

The river's edge is changing every year. The flats between the Hackensack and Passaic have been all reclaimed, and much along the Hudson. The jurisdiction of New York and New Jersey has advanced or receded with the water, whether the change was caused by alluvion or reclamation, by the act

of man or of God.  The land on which the trespass in this case was committed having ceased to be a river bed, the interest of the state was gone.  But if otherwise, and the state had an interest, it could not vest such interest in a private citizen; it could not cut off the plaintiff below from his water rights, depriving him of important privileges without a public necessity or a just compensation.  It would be a direct violation of the constitution.

ELMER, J.  It is admitted, on all hands, that the defendant in this court, who was the plaintiff in the Supreme Court, was at the time of the trespass complained of the owner of the property above the high water mark of the Hudson river, and abutting thereon; and it is also admitted, that if the said defendant, by reason of such ownership, or of his having appropriated the shore to himself by wharfing out, or by raising the land above the flow of the tide, previous to the passing of the act of the legislature of the 8th of November, 1836, had a title to the place where the alleged trespass was committed, then the judgment of the Supreme Court should be affirmed.  The place in question is ground artificially made between the original ordinary high water line of the river and the ordinary low water line, and must be understood by us as it was by the majority of that court, to have been reclaimed before the passing of the act referred to, upon which alone the title of the plaintiff in error is maintained.  The legislature did not, by that act, undertake to vest in Nathaniel Budd and his assigns any land to which the state had not itself a title, nor is it pretended that it could do so.

There can be no question but that, by the ancient rule of the common law, as understood in England at the time this state was granted to the Duke of York and since, the title of owners of land bounded by the sea or by navigable tide rivers extends only to the ordinary high water line, and that the title to the shore below that line, as well as of the soil under the water, is *prima facie* in the sovereign.  It having been authoritatively settled by the Supreme Court of the United States, in the case of *Martin* v. *Waddell*, that the title to this kind of

property was never vested in the boards of proprietors, so that they could grant the same to individuals, the important question in this case is, whether the ancient common law of England was adopted and remains in force in this state, or whether it has been modified by statute or by a local common law.

Upon the part of the plaintiff in error, it has been strongly insisted that the case of *Martin* v. *Waddell* establishes the principle, that by the common law of New Jersey, as well as by that law as held in England, the title to the soil below the ordinary high water of navigable tide rivers is vested exclusively in the sovereign power, and that the owner of the adjoining upland has no title to or right in the shore below that line. But I do not so understand that case. The plaintiff claimed no title or right as owner of any upland, but rested his claim wholly on a title to land covered by the waters of the Raritan river and bay, derived from the East Jersey proprietors; and the only question was, whether the private property of such land ever was vested in those proprietors, so that they could grant it to individuals. The court held that it never was so vested. Chief Justice Taney, who delivered the opinion of the majority of the court, puts the decision on the ground, that although the grant of Charles II. and the subsequent grant to the East Jersey proprietors included the shores and bottoms of the navigable rivers, yet that by the true construction of those grants, which included powers of government, and were to be regarded and interpreted as instruments upon which were to be founded the institutions of a great political community, they were granted simply as a part of the prerogative rights annexed to the political powers conferred on the grantees, and were not, like the upland, to be held or transferred as private property, but followed the sovereignty, and, upon the surrender of the powers of government, reverted with them to the crown. The common law doctrines in regard to the shores or to the soil under the rivers were no further in question than as they served to illustrate the meaning and to determine the true construction of the grants; and, of course, those doctrines were rightly assumed to be such as were established by the common law of England at the time the

grants were there made. The question now is, not what is the common law of England, about which there is no dispute, but what is the common law of this state. That some of the doctrines of the common law have never been considered as applicable to our circumstances, and have never been adopted here, and that others have been materially changed by our local usages, is not disputed. We are now to consider whether the rules of the common law in regard to the ownership of property adjoining to the sea or to our navigable rivers have been adopted in this state, or whether there is evidence that they never have been in force here or have been materially changed.

In the case of *Arnold* v. *Mundy*, Chief Justice Kirkpatrick puts the decision of the Supreme Court of this state, so far as the proprietary right was concerned, upon principles similar to those afterwards adopted by the Supreme Court of the United States. But in this case the plaintiff claimed not only under a proprietary right, but by virtue of his possession of the adjoining upland, so that the doctrines of the common law of this state in reference to shore owners were brought in question, and were held by the chief justice to be the same as those of England. It is to be remarked, however, that the decision of that point does not seem to have been essential to the determination of the case, and it does not distinctly appear whether the other judges agreed with him in that particular or not. The attention of the court was but little directed to it, the main stress of the case evidently being on the other point. No reference appears to have been then made to a local common law different from that of England, although two of the distinguished counsel engaged in that case, Mr. Wall, who was counsel for the plaintiff, and Mr. Wood, of counsel for defendant, afterwards, in the cases of *Martin* v. *Waddell* and of *Bennett* v. *Boggs*, admitted the existence of such a law. Be this, however, as it may, the case of *Arnold* v. *Mundy* cannot be considered as a controlling authority in this court. The principles upon which it was decided have been subjects of discussion and controversy ever since, and have not become, so far, established and settled rules upon which titles

have been founded, as to render it improper to bring them under review in an appellate court, where they come, for the first time, directly in question.

Is there then sufficient evidence of a common law in New Jersey, in regard to the title and rights of shore owners, different from the acknowledged common law of England? and if so, what is that law? According to Sir Edward Coke (2 *Inst.* 21), common right and common law are synonymous terms. It has always been regarded, and very justly, as one of the excellencies of the system of common law, derived originally from the general custom of the country, that it is not so inflexible as a statute, but may be modified from time to time, as circumstances require. It was said by the court, in the case of *Addison* v. *Otway* (2 *Mod.* 233), that the law hath great regard to the usage and practice of the people, the law itself being nothing else but common usage, with which it complies, and alters with the exigency of affairs. The constitution of this state, adopted in 1776, provided "that the common law of England, as well as so much of the statute law as have been heretofore practised in this colony, shall still remain in force, until they be altered by a future law of the legislature." It was insisted on the argument, and I admit correctly, that the mere fact of there being no positive evidence of the adoption of any principle of the common law prior to the Revolution, will not be sufficient to exclude it, if in its nature it is adapted to our circumstances, and is not in opposition to the principles of our government. The presumption undoubtedly is, that all the common law, not directly repugnant to our republican form of government, and not changed by statute, was in full force. Before it can be admitted to have been disused or modified, there ought to be very convincing evidence that a contrary usage was universal and of long standing, as was the case in regard to the duty of the sheriff in levying an execution, who, by the strict rule of the common law, was required to remove the goods levied on into his own possession: but who, by the custom of this state, adopted by the courts as its peculiar common law, is allowed to leave them in the hands of the defendant.

That it has been the common understanding, as well in West as in East Jersey, that the owners of land bounding on navigable waters had an absolute right to wharf out and otherwise reclaim the land down to and even below low water, provided they did not thereby impede the paramount right of navigation, is undoubted. The usage to do so from the earliest settlement of the country has been universal; and until recently the right to do so was never questioned, either by individuals or by the government. A vast amount of labor and capital has been thus expended, to the great benefit of the community. Not only wild marshes, overflowed at extraordinary tides, but large tracts of mud flats lying below the ordinary high water line of our rivers and navigable creeks, such as by the common law of England are held to be the property of the sovereign, and such as in the case of *Lowe* v. *Govett* (3 *B. & Add.* 863) were the subjects of a parliamentary grant, have been embanked and reclaimed, and by great expense transformed from a perfectly useless to a very valuable and productive property, by individuals or companies who never thought of obtaining grants for them, or licenses to use them from the crown or the colonial government or the state. The mud flats lying outside of the banks, and subject to the daily overflow of the tides, are now constantly resorted to for mud to repair the banks, and in many cases are indispensable to their maintenance.

There is the most ample evidence that this understanding and usage are of ancient date, and universal in all parts of the state. Much discussion took place on the argument before this court, as to the true construction of the patent from Governor Carteret for Bergen township in 1668, and of the subsequent deeds from the trustees of Bergen and the attorney of Robert Kennedy to John B. Coles, under which the plaintiff below claimed, and of the allotments made by the commissioners appointed by the legislature, in 1763, to make partition of the township of Bergen. Conceding that, according to the principles of the English common law, the true construction of the patent would be as it was held by the Supreme Court when this case was first before it in 1847, (1 *Zab.* 162) I think there is convincing evidence that the commissioners, when

they made the maps of the bounds of Bergen township the location of the several patents and grants, and the partition of the common lands in 1764, filed in the secretary of state's office and the clerk's office of Hudson, and produced before this court, took for granted that the parties bounded on the waters had an absolute right to the shore as far as low water mark, and that the several proprietors so used and enjoyed the premises without question or doubt. All the different lots described by those commissioners, which are bounded on the water, are left without any designation of the rights of the several proprietors to the shore itself. But there are two small lots excepted out of the West India farm, which was in the possession of Kennedy, numbered 3 and 4, which are not bounded on the water, but lie very near to it; and in regard to those two particular lots, the commissioners, after giving their boundaries, add, " together with all land lying in front down to low water mark." I cannot doubt that this special clause was added in these two cases because the boundaries are not described as touching the water, as in other cases, and because the understanding of the commissioners was that the mere bounding on the water, gave a right to the proprietor to the low water mark. If this may be considered, from the language of the respective allotments and the appearance of the maps themselves, as doubtful, I think there can be no doubt on the subject, if we take into consideration well established facts which are now matters of history. The commissioners appointed, in the year 1807, on behalf of the state of New Jersey to settle with commissioners on the part of the state of New York the jurisdictional line between the two states, all of whom were residents of East Jersey, well acquainted with the facts, and three of whom were experienced lawyers of high standing,* in one of their letters addressed to the New York commissioners, published by authority of the legislature of this state, (*Report*, *p.* 23,) make use of this language : " We may with perfect correctness state that, as far back as the memory of man extends, or any other evidence can be adduced, to the present

* The commissioners were Aaron Ogden, Alexander C. McWhorter, William S. Pennington, James Parker, and Lewis Condict.

hour, the inhabitants of New Jersey have used and uninter-ruptedly exercised the right of erecting and establishing docks, wharves, piers, ferries, and fishing weirs in front of their lands adjoining Hudson river and all other navigable waters." And this assertion was not disputed by the New York commission-ers. The commissioners afterward appointed on the part of New Jersey to settle the same controversy in 1827, at the head of which was that eminent lawyer Richard Stockton,* being unsuccessful in accomplishing the object, reported their proceedings to the legislature, and appended an elaborate statement of the facts and arguments in relation to the dis-pute, which was principally written by Mr. Stockton. On page 50 of this report it is stated that Archibald Kennedy, one of the king's counsel in New York, and receiver general of the king, made a location, under the East Jersey proprie-tors, of the farm at Horsimus, which was called the Dutch West India Company's garden, and might have been sup-posed to have been acquired personally by the king, as that company acted in a public capacity as governors of the coun-try while it remained under the dominion of the Dutch ; "and he exercised all acts of ownership on the adjacent waters un-der his New Jersey title." This statement is the more notice-able, because it appears, by a paper produced by the counsel of the plaintiff in this court, that, in 1802, Mr. Stockton was the attorney and agent of the heirs of Kennedy, and having by that paper assented, on the part of those heirs, to the act of the legislature, passed November 22, 1802, empowering commissioners to lay out a road to Nathaniel Budd's dock, and authorizing him to erect a ferry from his dock to New York, counsel erroneously supposed he must have considered the Kennedys to have had no title or claim to the shore below high water mark.

Now it is not pretended that this ancient and uninterrupted usage, at the very place now in controversy as well as in all other parts of the state, so emphatically asserted and so un-questionable, was authorized by any special grants from the

* The other commissioners were John Rutherford, Theodore Frelinghuysen, James Parker, and Lucius Q. C. Elmer.

crown or from the colonial or state governments. The regular common law mode of proceeding to authorize the erection of wharves or other structures on the shores of the sea or navigable rivers, where the property remains in the crown, is to sue out a writ of *ad quod damnum*, and upon the return of an inquest by a jury, finding that no damage would result to the king or others by the grant, the crown licenses what would otherwise be a pourpresture. But a license, obtained either with or without a previous inquest, does not authorize such an encroachment as amounts to a nuisance, it being held that the crown cannot license a nuisance. There is no trace of any such proceeding in New Jersey. There was, indeed, every thing in the circumstances of our people to render such a course unlikely. The erection of a wharf or dock was a public as well as a private benefit, and there has always been the strongest reasons for promoting, and none for hindering such undertakings. Even in England there is no doubt that many, probably most of the wharves, except in the great seaports, and harbors, are made on private property, It appears by the case of *Blundell* v. *Catterall* (5 *B. & Al.* 268) that much of the shores, and in some cases the beds of navigable rivers, are owned by the proprietors of the adjoining lands, claiming by prescriptions or under ancient grants, and that where manors adjoin them they are usually so held. Lord Hale, (*Har.* 27 *ch.* 16), treating of the shore, says, " it may not only be parcel of a manor, but *de facto* it many times is so." The prerogative of the crown, so far as it gave to the king the shores of the sea and of navigable rivers, rather as private property than as a sovereign right for the protection of the public, was not applicable to a distant province ; and, indeed, the exercise of it, so as to require in all cases a license to prevent him from seizing and abating or renting at his pleasure structures on the shores or marshes reclaimed from the tide, whether there was or was not an obstruction of the navigation, could not but have been considered as an intolerable grievance, and, had it been commonly insisted on would not have failed prominently to appear among the oppressive acts which occasioned and justified the Revolution. According to the reasoning of Chief

Justices Kirkpatrick and Taney, before adverted to, the king never granted to the proprietors of the province his *jus privatum* in the shores and soil of the navigable waters, but only that *jus publicum* which was essential to the powers of government. That the *jus publicum*, or, in other words, the sovereign right of jurisdiction over them is vested in the government of the state, and is ample for the protection of the public right of navigation and of all other public rights is undoubted. There is no evidence that the *jus privatum*, the right of private property in the shore to low water mark, was ever asserted in the colony as a right of the crown, or that it has until recently been claimed by the state; but there is on the contrary, in my opinion, the strongest evidence that this right has been abandoned to the proprietors of the adjoining land from the first settlement of the province, and exercised by them to the present day, so as to have become a common right, and thus the common law.

What was the origin of the usage, it may be difficult to say. If it be conceded that it arose from a mistaken apprehension of the doctrines of the English common law, or from what must now be admitted to have been a mistaken construction of the original grants to the first proprietors, I do not see that this concession will materially influence the result. The mistake was universal, and was acted on throughout the states. Mr. Griffith, an eminent lawyer of West Jersey, and especially distinguished for his knowledge of land titles, says, in his *Law Register* for 1821–2, that the construction had always been, that in case of land bordering on either fresh or tide water rivers, the owners held to the middle of the channel. This construction was probably founded on the doctrine insisted on by the New Jersey commissioners of 1807, in their correspondence with the New York commissioners, that the king having granted the rivers within and bounding on the province to the proprietors, as they assumed to be the fact, they thereby became private rivers, and thus the common law applicable to such rivers was attached to them. This doctrine has been overturned by the case of *Martin* v. *Waddell*, but the usage under it is a fact that remains. The rivers are

not private rivers; but so far as the citizens in general have acted for a long series of years under a usage, reasonable in itself and conducive of public good, which led them to bestow labor and capital upon property, to which under other circumstances they might have had no title, such a usage presents just that new exigency of affairs to which the common law so happily and so justly adapts itself. The mistaken origin of a usage will not necessarily prevent the courts from sanctioning it as right and lawful. Many of the most important doctrines of the common law had their origin in mistakes, one of its maxims being *communis error facit jus*.

A usage so universal and of such long standing, and in itself so reasonable, ought, in my opinion, to be adopted by the court as the law of the land. But this usage has besides the support arising from the fact, that it has been sanctioned, or at least acted upon and treated as legal, by many statutes of ancient and of modern dates. An act, passed in 1782, provides that "the owners of two-thirds of any body of marsh exposed to the overflow of the tide" may compel the other owners to unite with them in erecting and maintaining the banks. Here individuals are expressly recognized as the owners of property exposed to the overflow of the tide, without any restriction to cases where the property lay above the ordinary high tides; and under the provisions of this act much property originally below such tides has been reclaimed, and ever since occupied as private property. Long before this general act, there had been special and private acts of like tenor, providing for particular parcels of overflowed land. None of these acts purport to grant any rights of property. Their object is to provide a mode by which several owners of adjoining property may act in concert, and by which a minority of such owners may be subject to the will of a majority not less than two-thirds. Individual claimants of overflowed lands have always embanked them, as owners having a right to preserve their own property, according to their own views and as their respective interests might dictate.

Ferries were established at an early date over the creeks and rivers of this state, and in several cases acts were passed

regulating the tolls, that being a matter of public concern, but in none of them is there any thing like a grant of the land on the shore necessarily used in the erection of wharves and slips. In 1765, an act was passed laying out, and establishing by legislative authority, a four rod road from Newark to Bergen point, which extends the description of the road to low water mark on both sides of the intervening rivers, and empowers the commissioners to receive donations to defray the expense of the road and ferries; and in the seventh section provides that the proprietors of the soil at any of the places where ferries are to be erected shall have the privilege of erecting and providing such buildings and necessaries as are required, and of receiving the rents and profits. By a supplement, passed in 1768, the proprietors of the land adjoining the ferries are authorized to demand the occupation and sole management of the ferries, upon giving bond to keep up, maintain, and repair the causeways, ferry stairs, and ferry houses. One of the sections of this supplement recites that a dispute is subsisting between two individuals, who are named, touching the title to the meadow on the east side of Hackensack river, where the ferry stairs is fixed, and gives them twelve months after the determination of the dispute to demand the ferry. Bearing in mind the facts already adduced showing the common understanding to have been that shore owners were entitled to the land down to the low water mark, and were in the universal habit of using it as their private property, these acts, it seems to me, distinctly recognize that usage, and treat it as a common right. The road is laid in express terms over the upland and over the land of the shore down to low water mark, because private property was taken for public use, and it was understood that the private property extended to the low water mark, and the title of the proprietor to the ferry and to the shore between high and low water upon which the ferry stairs was erected, is acknowledged and protected. There are several other acts of very similar tenor, and many creating corporations with powers to construct piers and wharves necessarily extending below the high water line, in none of which, except some of quite modern date, is there any specific

grant of the land covered by water. They are all framed upon the principle, and take for granted, that every individual owning the adjoining land has a legal right to occupy and improve the shore at his pleasure, and are passed to give corporate powers to authorize what might otherwise be considered an obstruction of the navigation, and hence a nuisance, or to regulate tolls or other matters of public concern.

It is conceded, as well by those who contend for the application of the strict rule of the English common law to the shores of navigable waters in this state, as by those who think we have a local common law on this subject different from that of England, that the owners of the adjoining land in this state have the exclusive right of fishery on such shores. If this be so, then it follows that the English law is not in full force here. According to that law, the right of fishing on such shores is *prima facie* a common right, and does not belong to the owner of the upland, unless he owns also the shore, that is the land between the ordinary high and low water, or has by grant a several fishery. The case of *Bagott* v. *Orr*, (2 *Bos. & Pul.* 472) recognises the general right of the subject to take all kinds of sea fish, including even shell fish on the rocks and sand between high and low tide, in all cases where there is not a private right to the shore. If this common right of fishing on the shore extends so far as to include shell fish that do not swim, *a fortiori* it includes the right to take swimming fish by drawing a seine on the shore below the high water line where the private property commences. Indeed the right to do this was never disputed in England, and I suppose is just as well established there as the right to catch them by a hook and line from a boat. The recognition of such a right here would destroy every private shore fishery in the state. The exclusive right of the land owner in New Jersey does not arise, as Judge Randolph supposes, (2 *Zab.* 491) from the necessity of drawing the seine upon the upland, for no such necessity exists, except under peculiar circumstances or at high water, when the seines, in point of fact, are not commonly drawn at all. This right undoubtedly had its origin in the uniform practice of the holder of the upland to extend his

exclusive right to the soil down, at least, to the low water mark. It has long existed, not only on the shores of the Delaware, but on the shores of all the rivers and creeks of East and West Jersey where shad and herring come in sufficient numbers to make the right valuable.

In the case of *Bennet* v. *Boggs* (*Bald. R.* 76) Judge Baldwin says, "It is admitted that, from a very early period of the history of the state, shore fisheries have been considered as private property, capable of being devised and alienated with or separate from the land to which they are annexed, subject to taxation, and taxed as other real estate. It is not pretended that there ever existed a common right of fishery in the citizens of the state on or over the lands thus owned to low water mark." In the case of *Yard* v. *Carman* (*Penn.* 938), decided by the Supreme Court in 1812, Judge Pennington expressed himself very strongly against an exclusive right of fishery in the Delaware, and in favor of the common right of the people to catch fish in its waters; but the plaintiff in that case obtained his verdict upon a count which simply complained of the defendant for fishing in his "free fishery," and taking his fish, without in any way claiming title to upland or shore land or complaining of any unlawful entry upon his close. The rights of shore owners, as such, were not before the court, and the judge makes no reference to them, all his remarks being applicable to a case of fishing in the waters of the river, without interference with the shore. The decision of the court was upon another point. In other cases the right of the shore owner to the exclusive fishery has been sustained, both at the circuits and the bar of the Supreme Court.

Numerous acts of the legislature have sustained and regulated the fisheries in the Delaware and in several other rivers and creeks. The tenth section of the act of 1808 (*Rev. Stat.* 381) enacts that if any person shall lay out any seine into the river Delaware beyond the right angle of the shore and where his line strikes the river at low water mark a going out, or suffer it to swing beyond the right angle of the shore of the river, and where his line strikes it at low water mark a coming in, except by unavoidable accident, he shall be liable to pay

a penalty of twenty-five dollars to the person against whose land such trespass shall be committed. An act, passed in 1826, (*Rev. Stat.* 479) which applies to all the bays, flats, rivers, and waters within the state, makes it unlawful for non-residents to draw a seine therein to catch fish, with the proviso that nothing in the act shall be so construed as to affect the right or privilege of any owner or owners, tenant or tenants, not resident in this state, from fishing upon or opposite to his, her, or their own shore in this state. In both these acts, which are now in force, there is a distinct recognition of an absolute ownership, in the one case to low water mark, and in the other of the shore, which *ex vi termini* includes the land to low water mark, and the private right of fishery is treated as appertaining to such ownership.

But three cases of distinct grants of land covered by water or of the shore, by the legislature, are to be found in our statute books, and these have been made since the decision in *Arnold* v. *Mundy*. One was a grant of the Pea-patch, an island in the Delaware; another was a grant, to Col. Ogden, of land in New York bay, far beyond low water mark; the third is the grant to Nathaniel Budd, under which the plaintiff in error claims. None of these purport on their face, or could have been understood to interfere with or affect the shore between high and low water mark adjoining upland in the possession of any individual proprietor. The grant to Budd, whatever may be its validity or legal extent, upon which points I do not think it necessary to give an opinion, is contained in an act entitled, "An act vesting in Nathaniel Budd all the right and title of the state of New Jersey to a certain tract of land under water in the Hudson river," and there is nothing in the act itself which would lead any one to suppose that it included any land above the low water mark.

Directly after the first decision of the Supreme Court in this case (1 *Zab.* 167) the legislature, by an act, approved March 9, 1848, provided that it shall be lawful for the owners and holders of all docks and wharves to use, possess, and keep in order the same, and to demand and recover wharfage and dockage for the use thereof. By a subsequent act, approved

March 18, 1851, passed after the final decision which is now before us, shore owners are empowered to build on or otherwise improve the same to low water mark without restriction, and below that line by obtaining a license, in the manner therein prescribed.    These acts conform to the interpretation of the common law adopted by the court, and serve to show the necessity that was felt to protect rights acquired under the usage before supposed to be legal.

The facts and considerations above stated, it seems to me, establish not only a usage originating with the first settlement of this state, coextensive with its limits, and until recently unquestioned, for the owners of land adjoining to its navigable waters to appropriate to their exclusive use the shores of such waters to the low water line, but that this usage has been sanctioned by the courts and by repeated legislative enactments too unequivocal to admit of dispute and too plain to be disregarded. It may have originated in a mistake as to the true doctrine of the English common law in regard to such waters ; but it was suited to our wants and circumstances, and eminently conducive to the public good.    No one doubts that the legislature might at any time have altered the common law by a direct enactment to that effect ; and I do not doubt myself that it would have done so long ago, had it been supposed to be necessary to give to a common usage the validity of a common right. What they did not deem it necessary to do by direct enactment, they have done by many indirect provisions equally effective.

Can it now be wise or just to consider improvements thus sanctioned, so long enjoyed and so beneficial, as encroachments on the public domain, and at best dependant on future legislation or on the disposition of the courts to presume governmental grants, and thus set aside another doctrine of the common law, that time does not run against the sovereign power?    I cannot think so.

I have considered this question, thus far, without reference to the usages or laws of other states of the Union, because the precise question before us has reference to the common law of this state.    But it may well be regarded as affording no little

confirmation to the argument in favor of a modification of the doctrines of the common law here, if we find that a similar modification has taken place in other states situated, in reference to the common law of England, very much as we are. In Massachusetts, an ordinance was made, at an early date, giving to the proprietor of land adjoining the sea the right to the land to low water mark, not exceeding one hundred rods below the high water line; and although this ordinance was annulled, the usage still prevails, and is held to be the common law of the state. In Maine, to which the ordinance never extended, the same rule prevails. In Rhode Island and Connecticut, the usage of the owners of the land adjoining the water to wharf out is recognized as the local common law, and the owners are protected in the exclusive enjoyment of their improvements. In Pennsylvania, the proprietors of the land have the exclusive ownership of the soil to low water, arising out of a usage similar to ours, adopted as the common law of the state by the courts, independent of the statute. In that and some other states, the great rivers flowing through them, which are not tide waters, and according to the definitions of the English common law are not navigable and public, but private rivers, where the owners of the banks would have a right to the soil to the channel, are regarded as navigable public rivers, and the same law applied to them as to the tide waters. Indeed it is doubtful if any of the states recognize the doctrines of the common law of England on the subject of rivers and other waters precisely as they are held there. Those doctrines grew out of a state of things and of usages different from ours, and cannot be literally applied to circumstances so materially different as those found to exist in the United States.

After a careful examination of all the authorities applicable to this case that are accessible to me, and upon full reflection, I am of opinion that there is satisfactory evidence that the doctrines of the common law of England in regard to the shores of tide rivers have been materially changed in this state, by a common usage recognized as lawful by the legislature and · by the courts; and that, by the com-

mon law of New Jersey, the owners of land bounding on such rivers have an absolute and ·exclusive right to wharf out and otherwise reclaim and improve the adjoining shore to the ordinary low water line, and to the use of the same for fisheries ·and all other lawful purposes not obstructing the navigation. This right is incompatible with and excludes the right of ownership, which in England exists in the crown, and an encroachment upon which is there called a pourpresture, or enclosure of the king's demesne, and which, it is there held, he may seize and abate, or license and rent at his pleasure, and which, if it existed here, would be vested in the state. The state, having no right or title to the premises on which the trespass is alleged to have been committed, conveyed no title therein to Nathaniel Budd, or to those claiming under him, by force of the act of November 8, 1836. Consequently the judgment of the Supreme Court ought to be affirmed.

POTTS, J. Gough brought an action against Mary Bell for an alleged trespass, in breaking and entering his close in Van Vorst township, Hudson county. The plea was *liberum tenementum*, and the judgment for the plaintiff, to review which this writ of error is brought.

The plaintiff below was a tenant of the devisees of John B. Coles, deceased, occupying a farm owned by them of over 400 acres, bounded easterly on Hudson's river. Mary Bell claims title to a tract of 53½ acres, lying east of and directly in front of said farm, and between ordinary high and low water mark on the river. The alleged trespass was committed on this last mentioned tract, and the question is, whether Mary Bell has maintained her plea.

1. She sets up an adverse possession, as against the Coles title, to so much of this tract as was occupied by Nathaniel Budd, commencing anterior to 1802; but, in the view I take of the case, it is unnecessary to consider this part of it.

2. She sets up a title derived from the East Jersey proprietors, through Elisha Boudinot and others. As to this, it has been settled by the Supreme Court of this state, in *Arnold* v. *Mundy*, and by the Supreme Court of the United States, in

*Martin* v. *Waddell,* that since the surrender to queen Anne the proprietors had no title to the soil covered by tide waters in any of the navigable rivers or arms of the sea within the limits of the state: it is no longer an open question, and this, therefore, cannot avail her.

3. She claims under a grant from the state. On the 8th November, 1836, the legislature passed an act vesting in Nathaniel Budd, (whose title she has) his heirs and assigns for ever, all the right and title of the state to this tract, describing it as " a certain tract of land situate along the beach on the west side of the North, or Hudson's river, and running into the same between Powles hook and Hoboken, in the county of Bergen, &c., containing $53\frac{1}{2}$ acres, which was conveyed to the said Nathaniel Budd by Elisha Boudinot, by deed dated January 2, 1804."

Against this title the defendant in error insists—

1. That the act is void for misrepresentation appearing on its face. But I can find no such evidence, either in the language of the act itself or in the cause, as I think could warrent the court in sustaining this objection, even if we had the power to do so in this action on such a ground, which is, to say the least, questionable.

2. It is insisted that the Coles title to this 400 acre farm, derived from the Kennedys and the trustees of the freeholders of Bergen, embraces within its bounds this $53\frac{1}{2}$ acre tract by description, and was acquired anterior to the surrender to queen Anne. I have carefully examined the descriptions contained in the several deeds under which the Messrs. Coles claim, and the maps which have been submitted with them, and have attentively considered the arguments of counsel, and the result is that I am satisfied—1. That the Kennedy title went by description no farther than the line of the Hudson river. 2. That the grant from Philip Carteret and council to the town and freeholders of Bergen was limited to the shore line. And 3. Even if it was not, that the release from the trustees of the freeholders to the Coles was only of the Kennedy tract, and embraced nothing more than was embraced by description in the Kennedy deed.

3. But it is insisted, in the third place, that admitting the Coles title is bounded by description to the river line, yet that by established custom and usage, a local common law in New Jersey, riparian proprietors on tide waters take to the low water mark; that in this particular the rule of the ancient common law has been changed; and therefore, that this 53½ acres, lying between ordinary high and low water mark in front of this farm on the river, is embraced within it. Of this opinion was a majority of the court below, and if this be so it is fatal to the plea of the plaintiff in error; for, as the case now presents itself, it is this: the defendant in error is the tenant of a farm bounded on the Hudson river, where the tide ebbs and flows. In front of him, and *between high and low water mark*, is a cove embracing an extensive mud flat, and of this flat the above mentioned parcel is claimed by the plaintiff in error under a grant from the state.

It is admitted that by the common law of England the strict legal title to the shores of rivers where the tide ebbs and flows, that is the land between ordinary high and low water mark, was in the crown. It is admitted that when our ancestors came from England to this colony they brought so much of this common law with them as was suited to their circumstances. They did not consider it imposed on them as a burthen; they claimed it as a *right*. The colonial legislature, in 1678, enacted, "That no man within this province shall be deprived of the benefit of the common law, and a free process therein, as of right belongs to every free English subject." But it is equally true that some portions of the common law of England were purely local in their character; other portions again respected only the royal prerogatives and revenues; and other portions still, such as right accruing by custom and prescription, never were received here as common law. *Ackerman* v. *Shelp*, 3 *Halst.* 130. And from the language of the 22d section of the constitution of 1776, it is clear that this was the view of the framers of that instrument; for it says, " that the common law of England, as well as so much of the statute law *as have been heretofore practised* in this colony, shall still remain in force until they shall be altered by a future legisla-

ture, such parts only excepted as *are repugnant to the rights and privileges contained in this charter.*"

I think it may be safely assumed that when we separated from the old government by the act of revolution, for that act effected the separation, and not the treaty of 1783, nothing remained of British laws and institutions but such as we voluntarily chose to gather up from the wreck, and use in the reconstruction of our new institutions; and if we did not re-adopt the common or statute law of England as a whole, but only such parts of it as had been in use and were adapted to or in consonance with our new system, it does not follow as a matter of course that all, either of the rights and prerogatives of the British crown or the powers of the British parliament, became vested in the state government or in the legislature. All power, upon the dissolution of government, originally vested in the people of the state, as the sovereigns of the country; and if this be so, these powers are to be sought for now in the institutions and laws of the people themselves. The state government possesses the rights and powers granted to it by the people in the constitution in terms or by necessary implication only. The rights not so granted remain in the people themselves. And it would seem to follow, that whatever right or title the legislature, as representing the people, has in the lands between high and low water mark on the sea shore and the shores of tide rivers must be a right or title vested in it by the constitution which created it, or which, in the very nature of things and of necessity, is inherent in that department of the government.

The question then recurs, where is the legal title to lands between high and low water mark on tide rivers in New Jersey? Is it in the government or in the riparian owner? At common law it was in the crown, and not in the owner of the *ripa.* Before the Revolution the common law rule was undoubtedly in force. The title was in the crown, not in the proprietors, or those who held under them. How is it since the Revolution? The common law, as theretofore practised, was readopted. And it seems a fair inference that this readoption vested the title in the state government; that at least *prima*

*facie* it is there, in the absence of evidence to the contrary, subject, however, to any modification or limitation which may be found in or fairly deduced from the exception contained in the 22d section of the constitution.

But the argument is, that the common law, in this respect, has undergone .a change since the Revolution, in this state. It is affirmed that the riparian owner has always claimed and exercised ownership over this species of property; that numerous docks and wharves have been erected without legislative authority; that extensive flats have been reclaimed and banked in as meadow lands, and the titles to them recognised by numerous laws; that the right of private fishery has been admitted and regulated by the state; and from these premises, and an alleged prevalent public opinion, in the early period of the government particularly, it is argued that there is a common custom or usage on the subject established of sufficient duration and universality to amount to a local common law.

I am unable to reach this conclusion. The weight of authority is against it. It has been distinctly held, that in this state the rule of the common law remains unaltered; that high water mark constitutes the boundary between the proprietary and the sovereign titles. *Arnold* v. *Mundy*, 1 *Halst.* 1; *Martin* v. *Waddell*, 16 *Peters* 367. And see *Pollard's Lessee* v. *Hagan et al.*, 3 *How.* 221. And the same doctrine was reaffirmed by the Supreme Court when this case was first before them. 1 *Zab.* 156. In no case in New Jersey was it seriously questioned until in the case we are reviewing, and then with hesitation and by a divided court. *Stare decisis* is a maxim of great weight where questions of property are involved. Beside the weight of judicial authority, that of legislative construction is against it. Numerous acts have been passed by the legislature, particularly in late years, authorizing riparian owners to erect docks and wharves on navigable streams opposite their lands. In 1848, *Pamph. L.* 217, a general act was passed authorising the owners and holders of all docks, wharves, store houses, and piers, to use, possess, repair, and keep the same in order, provided that the act should

not impair the legal rights of any other persons or authorize any hindrance to the navigation. And in 1851, *Pamph. L.* 335, another general act was passed authorizing the owners of lands upon tide waters to build wharves in front of the same. This course of legislation is certainly in conflict with the proposition sought to be maintained, for the grant of a right to use land presupposes title in the grantor; and I think it by no means clearly appears that the title to reclaimed meadow lands or the established rights of private fishery in New Jersey rest upon any such foundation.

4. But the question still remains, did Nathaniel Budd take any title to these premises under the act in question? The grant from the state, this act of 1836, was nothing more or less than a mere release to Budd of such right and title as the state had to this land under water, and could rightfully grant *to a private person for a private use.* The preamble of the act says, " it hath been suggested that the state of New Jersey hath some title thereto, and by reason thereof doubts have arisen concerning the title of said Nathaniel Budd," and it passes all the right and title of the state to him " in as full and ample manner as the state of New Jersey hath right and title to convey and grant the same." *Pamph. L.* 1836, 14. This phraseology is carefully guarded, and leaves the question before us open for discussion by its very terms.

Assuming, then, that so much of the ancient common law as was suited to our new institutions was readopted by the constitution of 1776, and that the strict legal title to lands between high and low water mark vested in the state, it is equally clear that the long established and essential rights of persons and of property, as defined and settled by that law, were also readopted and remain in force. Among these are—

1. The rights of riparian owners. The defendant in error stands here clothed with all the rights which, at common law, belong to such an owner. These rights are as sacred and inviolable as any others. They are appurtenances to the estate, constitute part of its intrinsic value, and can no more be taken from him contrary to law than any other portion of his property. He has a right, though his strict legal title is bounded

by the high water line, to the water, as appurtenant to the up-land; a right of towing on the banks; of landing, lading, and unlading; a right of way to the shore; a right to draw seines upon the upland, and of erecting fishing huts. *Angell on Tide Waters* 171. He cannot be cut off from the water against his consent by any extraneous addition to his upland. 2 *Whart.* 538. No supervening right over any part of this space can be exercised or maintained without his consent. He has the right of fishery, of ferry, and every other which is properly appen-dant to the owner of the soil; and he holds every one of these rights by as sacred a tenure as he holds the land from which they emanate. *Bowman's devisees* v. *Waltham*, 2 *McLean's C.` C. R.* 376. And Justice McLean, in this case, adds, " The state cannot, directly or indirectly, divest him of any one of these rights, except by the constitutional exercise of the power to appropriate private property for public purposes; and any act of the state short of such an appropriation, which attempts to transfer any of these rights to another without the consent of the proprietor, is inoperative and void, and can afford no justification to the grantee against an action of trespass."

In *Harrison* v. *Sterret*, 4 *Harris & McHenry* 540, it was held that placing sand, earth, and stone in the waters of the Petapsco contiguous to the plaintiff's shore, so as to make dry land, and deprive him of the privilege of sailing with scows and boats to and from his land, was actionable. And there are abundant authorities, both in England and in this country, to show that any infringement of the riparian right to the use of the water for all purposes draws to it a remedial right of re-dress or compensation; a right modified, it is true, in some in-stances where the doctrines of the civil law have been invoked, as in Louisiana, Illinois, and Tennessee. *Bath River Navi-gation Co.* v. *Willis*, 2 *Railway and Canal cases* 7; *Ball* v. *Herbert*, 3 *Tenn. Rep.* 253; *Middleton* v. *Pritchard*, 3 *Scam-mon's* (Ill.) *Rep.* 520; *Memphis* v. *Overton*, 3 *Yerger's* (Tenn.) *Rep.* 390.

And while the riparian owner has at common law a right to the use of the water that flows to his shore, the public have

no right to the use of his shore for any purpose, except in cases of storm or distress. If, says Lord Hale, A. hath the *ripa* or bank of the port, the king may not grant a liberty to unlade upon that bank or *ripa* without his consent, unless custom hath made the liberty thereof free to all, as in many places it is, for that would be to prejudice the private interests of A., which may not be taken from him without his consent. *Hargrave's L. T.* 73; *Blundell* v. *Catterall*, 5 *Barn. & Ald.* 91; *Ball* v. *Slack*, 2 *Whart.* 530; *Chess* v. *Manown*, 3 *Watts* 219; *Cooper* v. *Smith*, 9 *Serg. & Rawle* 26; *Post* v. *Pearsall*, 22 *Wend.* 425; 20 *Wend.* 111.

These doctrines, I apprehend, rest upon sound and safe principles, and interpose an impassable barrier behind which the citizen may find protection against the power of the state itself. For surely it cannot for a moment be maintained that it was ever the intention of the framers of the constitution, even by implication, to vest in the state, or in the legislature, as the law making power of the state, such a title to the strip of land, the shore between high and low water mark, along the banks of all the navigable rivers and streams in the state, as that it could grant, sell, or dispose of it to any private person for private use, so as to destroy every pre-existing right of the riparian owner, and interpose new owners between him and the navigable waters. Such a doctrine would certainly be received with equal surprise and consternation. As the first step in the argument to maintain it, it would be necessary to assume the absolute omnipotence of the legislature, except so far as its powers are limited by express constitutional restraints. And if this be so, and those limitations are not broad enough to protect the common law rights of the riparian owner, what protection would the plea of usage or custom or a local common law afford him?

In most of our sister states these rights of the riparian owner have been carefully regarded, if not extended. In Massachusetts such owners, by a colonial ordinance, passed in 1641, and a usage which probably sprung up under it, for the ordinance itself was subsequently repealed, are entitled to the flats opposite to their land to the channel; and in Pennsylvania,

lands on the navigable rivers between high and low water mark are held not to be within the jurisdiction of the land office, so as to be the subject of grant by warrant, survey, and patent from the proprietary. *Freytag* v. *Powell*, 1 *Whart.* 536. It is no uncommon thing to find springs between high and low water along the banks of the Susquehanna, and though such appendages are often matters of convenience at some seasons of the year to those who live near, yet the state never sold land below high water mark. *Commonwealth* v. *Fisher*, 1 *Pa. Rep.* 467. And see 2 *Zab.* 468–9, 3 *Kent's Com.* 428, &c. In some cases, it is true, these rights have been denied. There are such cases in New York, of which *Gould* v *The Hudson Railroad Co.* is one, *Monthly Law Rep., June* 1852 ; but the current of authority in the states is the other way.

2. But, besides this, there is another class of rights which may be considered in a question of this kind, to wit, the public rights of navigation and fishery. This 53½ acre tract is part of a public navigable river, every part of which is impressed with the public servitude. Chief Justice Kirkpatrick, in *Arnold* v. *Mundy*, speaking of the title to this kind of property, says, " the wisdom of the common law has placed it in the hands of the sovereign power, to be held, protected, and regulated for the common use and benefit "—" though this title, strictly speaking, is in the sovereign, yet the use is common to all the people." And again, " the enjoyment of it is a natural right, which cannot be infringed or taken away, unless by arbitrary power." And he adds, " If this be so, it will be asked, how does it happen that in England, whose polity in this respect we are now examining, we find not only navigable rivers, but also arms of the sea, ports, harbors, and certain portions of the main sea itself upon the coasts, and all the fisheries appertaining to them, in the hands of individuals? That the fact is so cannot be controverted ; but how it become so is not so easy at this period satisfactorily to show. So far as it depends on royal grants, however, it seems pretty clear that it has always been considered an encroachment upon the common rights of the people." And after stating the doctrine, that the legal title to this common property, subject

to the restrictions he mentions, vested at the Revolution in the people, and passed to the legislature, as their representatives, he continues, " that is nothing more than what is called the *jus regium*, the right of regulating, improving, and securing for the common benefit of every individual citizen ; " and " the sovereign power itself, therefore, cannot, consistently with the law of nature and the constitution of a well ordered society, make a direct and absolute grant of the waters of the state, divesting all the citizens of their common right."

Although the law making power was granted to the legislature by the constitution of 1776 in broad and general terms, yet it was a power to make laws for the regulation and protection, not the destruction of private and public rights. It had the power of eminent domain, but its exercise was coupled with limitations; it could neither take private property for private use, nor even for public use, without providing for compensation to the owner. It was not only restrained in this respect by the constitution of the United States, but by the principles of natural justice. " The familiar principle, that private property shall not be taken for public use without just compensation, is a dictate of natural justice ; it is founded in natural law ; it has its origin back of political institutions." 2 *Zab.* 302. Again. The right of eminent domain of all the states over the tide waters, and the soil under them, within their territorial jurisdiction, is undoubtedly subject, to a limited extent, to the power of the general government of the United States. It cannot be exercised in a manner repugnant to the constitution of the United States in the following particulars: 1. The power to regulate commerce ; 2. The provision that the citizens of each state shall be entitled to all the privileges of citizens of the several states. *Angell on Tide Waters* 59. The tide waters of all public rivers belong to the public for the purposes of navigation, not only to the people who are represented by the legislature of a particular state but to the people of all the states.

These being well established general principles, it only remains to see what their effect is upon the questions involved in this case. It seems very clear that all the rights which the

Messrs. Coles had, as riparian owners, before the passage of the act of 1836, remain unaffected by it. It seems equally clear that the *jus publicum*, with all its incidents, remains—for the legislature had no power to dispose of the one or the other class of rights *to a private person for private use.* And if neither any right of the riparian owner, nor any right of the public to navigate these waters, passed to Mr. Budd by the act, there is nothing in the grant that could be the subject of individual property or enjoyment.

But it does not follow that property of this description cannot be improved for purposes and in a way consistent with the substantial rights of the riparian owners and the public by legislative authority. Free and convenient navigation of navigable waters being a primary object, the legislature of a state may promote it by artificial means, and render the water more useful to the public for navigable purposes, even though the privilege of *fishing* of the riparian owners may be thus impaired. *Angell on Tide Waters* 83 ; *Hart* v. *Hill*, 1 *Whart.* 136. The legislature may authorize flats in tide rivers to be raised by artificial means above high water; may authorize the shore to be filled up and banked out to the deep water, provided it be done with the consent of the riparian owners, or with compensation to them, and upon the overruling principle of the public good. And so the legislature may authorize the adjoining proprietors to build wharves and docks in front of their lands on the shore between high and low water mark, and, subject to certain limitations, even beyond it, as they have in fact done ; because the exercise of this power is expressly *for the promotion, not the destruction of the public right of navigation;* and this has been the principle, I apprehend, which has governed the legislature in the numerous grants made for this purpose, and in passing the acts of 1848 and 1851, a principle derived from the common law, and sactioned by judicial as well as legislative authority. But it has no power to divest the rights of shore owners or the public over this description of property by grants to private persons for private use, because this would be to cut off the riparian owner from the shore and take away from him

rights appurtenant to his estate, and perhaps sacrifice public rights for *the promotion of mere private interests.* Nor can it grant such a right to others than the shore owners, even for public purposes, without their consent or compensation to them.

If a shore owner, without such a grant from the state, erects docks or wharves in front of his land, if no public rights are infringed, if the navigation and the fishery are not impaired, though at common law it would, technically, be a *pourpresture,* it would not be a nuisance, nor indictable as such. It is believed there has been no case in this state in which a proceeding has been had, either by information of intrusion at common law or by information at the suit of the attorney general in equity, to abate *such* a pourpresture, or suffer it to remain and be arrented. All owners of docks and wharves erected prior to 1848 are now protected from such a procedure by the act of that year; and since then, doubtless, all that have been erected have had the license of the state or are within the act of 1851.

These principles seem clear of difficulty; they treat the rights of riparian owners as property rights, to be guarded and protected, while they preserve the common law rule in reference to the rights of the public and the state, leaving to the legislature the power of regulating, improving, and securing the property they hold in trust for the common benefit of the people, and to the individual citizen his private rights. And leaving it there, it is left where it is safe to leave it.

The result is, that though the legal title of the Messrs. Coles, under whom the defendant in error holds, extends only to the line of ordinary high water mark, yet they possess rights, as riparian owners in the adjacent shore and waters, of which they cannot be divested without their consent, or compensation; that the land between high and low water mark belongs to the state for the use and benefit of the public, but that this title cannot be granted to a private person for a private use; that the act of 1836 is inoperative and void, and that, consequently, as no title passed from the state to those under whom the plaintiff in error claims, she has failed to maintain her plea, and the judgment below must be affirmed.

NEVIUS, J. This is an action of trespass *quare clausum fregit*, by the defendant in error against the plaintiff in error. The defendant below pleaded *liberum tenementum*, and, on the trial at the Hudson circuit, the parties agreed upon a case embodying the testimony, and that the same should be submitted to the court at bar for final decision. Upon the argument before that court, a majority of the judges determined that the title to the *locus in quo* was not in the defendant below. To review this decision, the present writ of error is brought. As a full statement of the facts out of which the questions here presented arise has already been published, (2 *Zab.* 441) it is unnecessary to repeat them.

The land upon which the alleged trespass was committed lies between what was formerly high and low water mark on Hudson river, or rather on the margin of a small bay or cove of that river, in the county of Hudson. It was formerly the shore of the bay, but, in 1836, had been reclaimed from the overflow or influx of the tide water by the Messrs. Coles, who were at that time, and had been before, and still are, the undisputed owners of the upland adjacent thereto, and under whom the plaintiff claims the right to bring this action.

The burthen of proof upon the pleadings and issue joined in this case devolved upon the plaintiff in error, and if she has failed to establish a legal and valid title to the lands in question, the judgment of this court must be in affirmance of the judgment of the court below. I proceed, then, to an examination of the title which she has presented as the foundation of her claim.

She first claims title to the premises under a survey from the board of proprietors of East Jersey to Elisha Boudinot for 53½ acres of land, including the lands in question, dated the 21st of May, 1803, and has shown that whatever was vested in Boudinot by virtue of that survey, by subsequent conveyances became vested in her.

Her second ground of claim is under an alleged grant from the state of New Jersey, of the 8th of November, 1836, which is a grant of all the right the state then had in and to all the land described in the survey to Boudinot.

In regard to the first, I think, with the court below, that this survey to Boudinot conveyed no title or interest to the lands in dispute. It is admitted by the parties that this survey covers what in legal parlance is called the *shore* of the river or cove, that is, that portion of land which lies between the lines of high and low water mark at ordinary tides.

In common parlance, the word *shore* is understood to mean the line that separates the tide water from the land about it, wherever that line may be, and in whatever stage of the tide. But taking, as I now mean to do, the word *shore* in its legal and technical sense, as indicating the lands adjacent to *navigable* waters, where the tide flows and reflows, which at high tides are submerged and at low tides are bare, I repeat, that the proprietors had no such property in the shore as would entitle them to convey it to a private person for private purposes separate from the adjoining upland, which had previously been conveyed to another. But even if any such right was ever vested in them, they had before conveyed it to the town and freeholders of Bergen by their charter of 1668.

The grant to the Duke of York, and from him to Carteret and Berkely, and from them to the twenty-four proprietors, invested the grantees with the absolute title to all lands included within the limits of the grant (which could be held in severalty by private individuals, without encroachment upon public and common rights,) and also with the sovereign and governmental authority over the whole territory granted. It is proper, therefore, that we discriminate rightly between the proprietary and sovereign titles. So far as they regard dominion and power over the soil, and property in it, the former is absolute, subject only to the power of eminent domain in the government, the latter qualified or fiduciary. The former may be parcelled out in severalty, and granted to private individuals for private purposes, the latter belongs to the nation, and were only held by the sovereign authority for the common and public use of the nation. The proprietary title extended to such property as in its nature could be severed from the public domain and devoted to private and exclusive use without any interference or infringement of public and common

right, such as all the soil above tide waters. The sovereign title extended to all such property as could be used and enjoyed in common without conflicting with private rights, such as the shores and beds of the sea, arms of the sea, bays, or lakes, where the tides ebb and flow. By the common law of England at the time of the grant to the Duke of York, the title to lands which could be held in severalty by the subject adjacent to navigable waters was limited by high water mark, and all the soil which lay beyond that was said to be vested in the crown, as trustee, for the common use of the nation.

This, according to the opinion of C. J. Kirkpatrick in *Arnold* v. *Mundy*, "is that species of common property which the king himself could not appropriate to private use, nor grant in severalty to any one else." The right of the crown to this property is not very appropriately termed a title, but is more properly a power over it, to keep it open and free for common use; or if approved by fencing, embankment, or wharfing, to see that it is done at such places and in such mode as best to promote public interest and convenience, and not prejudice either. It is a power or right to protect such lands for the common welfare, and not a right of freehold in the soil, which cannot lawfully be appropriated to private use at the will or caprice of the sovereign power. But it may be said, and the fact is so, that in England much of this species of property is found in the hands of private individuals, who hold it in severalty and to the exclusion of the public, and who claim either by express grant from the crown, or by prescription, which is founded on the presumption of such grant. The learned judge, to whom I have just referred, remarks, in the case above cited, that at this day it is not easy to explain how this became so, but supposed it originated in the usurpation of arbitrary monarchs or powerful barons before the principles of legitimate civil government were as well understood and settled as at the present day. But if such practice prevails at this time in England, or has been exercised by the government of this state at any time, it can only be sustained on the hypothesis that such grants are rather promotive of the public interest than prejudicial to it. I entirely concur in the opinion

of C. J. Kirkpatrick when he says, "that Charles II., when he took possession of this country in his sovereign capacity, acquired the right to grant the soil of the country to settlers and citizens, extending to high water mark on the coast of the sea, and navigable rivers where the tide ebbs and flows, and no farther; and that he could not convert the shores, which were common property, into private property.

But I am also of opinion that he had the right, by virtue of his sovereign prerogative, to confer upon a private individual, who was a riparian owner of lands bordering on such waters, the right or privilege of excluding tide waters, by means of embankments, docks, wharves, or other contrivances, to reclaim drowned lands otherwise useless, to improve and increase the facilities of navigation, to protect ports and harbors, or to promote trade and commerce, so far as the same could be done without injury to the public and common right.

I am further of opinion that, by the true principles of the English common law, adopted in this state by the constitution of 1776, and adapted to the condition and requirements of our government, the owner of a freehold estate· on the margin of tide water navigation has rights appurtenant to his freehold in the adjoining shore (if not exclusive and private) paramount to those of any other citizen; that he has the legal common law right of ferry at all times of tide, which brings him to the water's edge, wherever it may for the time be, the right of drawing scines, of passing at pleasure from his soil to the water, or from the water to his soil or freehold, of landing from or embarking in his boats or vessels at the water's edge at all times of tide; and finally, as appurtenant to his riparian ownership, the right to exclude the influx of the tide by the erection of embankments, docks, or wharves, provided he does not impair or interfere with the common right of navigation or fishery or any other common right; that he cannot be deprived of these rights either by the prerogative of the crown or by parliamentary or legislative power, except it be upon the doctrine of eminent domain, when he is to be compensated by the government for the rights of which he is divested for pub-

lic or private good.  Neither the crown of Great Britain, by virtue of its royal prerogative, nor the lords proprietors of New Jersey before the Revolution, by virtue of their grant, nor the people of the state, by their legislature since the Revolution, could deprive the riparian owner of any of these rights, by the principles of the common law, without just compensation.  And if at any time, in England or in this state, the riparian owner has been deprived of these natural and incidental rights annexed to his freehold, either by the authority of royal prerogative, or parliamentary authority, or by legislative authority, it has been in violation of common law, unless compensation has been provided for the encroachment.  Such I take to be the doctrine of the common law, as it is the rule of common sense and common justice.  And wherever or whenever the crown or parliament of Great Britain have made a grant of shore lands to private individuals for private purposes, without the consent of the riparian owner and without compensation, it has been in violation of his rights and against the law of the land, and may be likened to other abuses or violations of common rights, which at different periods are to be found in the history of the English government, as the granting of monopolies in trade to favorites of the crown.

My conclusion therefore is, that the proprietors of New Jersey, by virtue of the grant from Charles II., never had such a title in the shores of navigable waters as could lawfully be conveyed by them in severalty to private persons, and divest the riparian owner of those rights I have mentioned as incident to his lands.

But even admitting that originally they had such right, yet in the present case their survey to Boudinot in 1803 was inoperative and void, not only in consequence of the surrender of the government by them, in 1702, which divested them of all control over property before held in trust for the common and public benefit, but also by reason of their charter to the town and freeholders of Bergen, in 1668, while both the proprietary and sovereign titles were vested in them.  This charter was made by Berkely and Carteret, the immediate grantees of the Duke of York, and contains 11,520 English acres, the east-

ern boundary of which is described to be " by Hudson's river," and the grant in express terms includes " all rivers, ponds, creeks, islands, inlets, bays, and all other appurtenances to the same belonging." This grant embraces the land in question, and, as it was made to a political corporation, it may be construed to convey all the right and title, whether of soil or government, in and to the territory included in the description, subject to such reservation and limitations as are expressed in the grant. In that description Harsimus bay, with its adjacent shores covering the disputed premises, are most clearly included. Berkely and Carteret, then, having by this charter parted with all their right and interest in these lands, in whatever capacity they held it, either as proprietors or sovereigns, the board of proprietors could not acquire from them any title to these lands, and of course could convey none.

It follows, therefore, that the survey to Boudinot in 1803 is wholly inoperative and void, and cannot support the title set up by the defendant below.

I now consider the second ground upon which she relies in support of her plea. It is an act of the legislature of New Jersey, passed November, 1836, entitled " An act vesting in Nathaniel Budd all the right and title of the state of New Jersey to a tract of land under water in the Hudson river, in the county of Bergen, and state of New Jersey." The preamble recites, that it had been represented to the legislature that Budd became seized and possessed of $53\frac{1}{2}$ acres of land at Harsimus, by virtue of a deed from E. Boudinot, which was surveyed to him, and located by special order of the board of proprietors, and that it had been suggested that the state of New Jersey had some title thereto—It was therefore enacted, that, for good considerations, and one dollar paid to the treasurer of the state, all the right and title of the state to a certain tract of land, situate along the beach on the west side of Hudson river, and running into the same between Powles hook and Hoboken, containing $53\frac{1}{2}$ acres, and which was conveyed to Budd by Boudinot, in 1804, be, and the same are hereby granted to Budd, his heirs and assigns for ever, and shall for ever be vested in him, his heirs and assigns, as fully as

the state has right and title to grant the same, reserving the right of jurisdiction and sovereignty.

The defendant below traced her title also to this grant.

Without stopping to inquire whether Nathaniel Budd was actually seized and possessed of these lands at the time the act was passed by virtue of his deed from Boudinot, as is recited in the preamble of the act, or whether said lands were then covered with water or had been reclaimed, or whether the grant was obtained by any fraudulent practices upon the legislature, I am of opinion that the state had no such right or title to the soil as would invest in Budd an absolute fee simple title, not only to the exclusion of all public use, but to the exclusion of all rights and appurtenances incident to the title of the adjacent upland.

1st. Because the king of Great Britain, when he took possession of the country, acquired no such right to shore lands as would warrant his grant in severalty to a private person for private and exclusive purposes ; that his grantee acquired no such title, that the board of proprietors derived no such title by the grant to them ; that after the Revolution, the people of the state, in their sovereign capacity exercised through their legislature, acquired no such right or title, either in shore lands or beds of the sea, bays, or navigable rivers, as would justify or maintain a grant in severalty for private purposes to the prejudice of public and common right, or the natural, incidental, and appurtenant rights of the riparian owner. The grant, therefore, contained in this act of assembly, whatever it may be, (if a grant at all) and however obtained, is in my opinion invalid, and cannot be the basis to support the plea of *liberum tenementum*.

2d. Because, if upon common law principles or upon the principles which naturally, rationally, and necessarily appertain to legitimate sovereign authority, the state would have acquired upon the Revolution the lawful power to grant such lands in severalty, yet in these particular lands that right had before been vested by a recognized conveyance to the town and freeholders of Bergen, and consequently was not vested in the state or the people of the state. The only power the

state acquired over them by the Revolution was the power of eminent domain, to be exercised for public, and not private purposes, and then (by the constitution) upon just compensation to every individual whose lawful and established rights were impaired or destroyed. The charter of 1668 debarred the state from making a special grant of these lands to a private person for private purposes, and the defendant below has not maintained her plea on this title.

Much has been said, in the argument of this cause and by the court below in determining the case, on the subject of riparian title. On the one side, it is contended that the common law of England gives to the owner of land bordering on and bounded by " a navigable river or bay, with an ebbing and flowing tide, a title to the soil only to high water mark ;" and such is undoubtedly the rule of the common law, founded upon some principle, for all below it in general is necessary for public use or convenience, and the shore itself, without being reclaimed from the overflow of the tide, is not in its nature adapted wholly to private and exclusive occupancy. On the other side, it is insisted that we have in this state a local common law, which extends the title to the soil in a riparian owner to low water mark on navigable tide water streams. It is difficult at this day to ascertain with any satisfactory certainty at what time and upon what principle the practice originated in New Jersey of conveying lands by documentary title on the margin of tide waters to low water mark. But my own personal knowledge, as well as my information derived from reliable sources, has satisfied my mind that such a practice has very generally prevailed throughout the state, and probably before the Revolution. If it has any legitimate origin, it is founded probably on the grants and concessions issued by the lords proprietors, in 1664, to emigrants, adventurers, and settlers. By these grants, convenient proportions of land for highways, streets, churches, forts, wharves, bays, and harbors were granted or promised as inducements to immigration and settlement. Upon these concessions, undoubtedly, was founded the practice, which from time out of mind prevailed here, of taking the lands of private persons for public highways, with-

out making compensation to the owners; and it is not improbable that the practice of riparian owners occupying the shores to low water mark, whether by the terms of their documentary title they were limited there or not, has arisen from the same source.

But whatever may be the general practice on this subject, or whatever the extent of documentary title to lands on the margin of tide waters, or in whatever mode such practice may have originated, I am nevertheless disposed to repudiate the idea of a local common law contrary to the principle of the English common law, and to adopt the latter, with those qualifications I have mentioned, and which I believe, upon every principle of common justice, common sense, and common right, appertain to it, and are perfectly consistent, not only with the nature and elementary principles of our own government, but with the rights of the citizen and all free government.

From the views I have above expressed, and the reason I have assigned for them, I think the following propositions are to be adduced as the necessary results:

1st. That the survey from the board of proprietors to Elisha Boudinot, in 1803, and his deed to Nathaniel Budd, in 1804, conveyed no title to the lands in question, and that the defendant's claim on this ground must fail.

2d. That the grant from the state of New Jersey, by act of 8th of November, 1836, conferred no several and exclusive right to the soil of the lands described therein, and upon this ground the defendant's claim is invalid.

3d. That while the common law of New Jersey limits the title to the soil in the riparian owner to high water mark on tide waters, yet such owner has, as appurtenant to his title, a right to reclaim the shore in front of his lands, by embankments, wharves, or docks, if he can do so without impairing or injuring the public and common rights of the community.

4th. That neither the king of Great Britain, before his grant to the Duke of York, nor the board of proprietors, before the Revolution, nor the people of the state of New Jersey, by their legislature since the Revolution, had or have now the right to make a grant of shore lands in front of a riparian owner to a

private person for private purposes, without the consent of such owner, or making him compensation.

I think the judgment of the court below must be affirmed.

OGDEN, J. The points in this cause, upon which the arguments were made before the court, having been so fully elaborated in the opinions already delivered, I should have simply concurred in an affirmance of the judgment, if I had been prepared to adopt *all* the propositions which have been laid down by either of my learned brethren. Having reached a like result with them, as to the disposition of this cause, I will accompany my vote with as few remarks as is consistent with the view that I have taken of the questions.

The action was originally brought in the court for the trial of small causes by the defendant in error, who was a lessee of John B. Coles and others, heirs and devisees of John B. Coles, deceased, for an alleged trespass in cutting and carrying away grass which grew upon premises in his possession ; and upon a plea of title it was removed to, and after issue joined was tried in, the Supreme Court, where judgment passed in favor of the plaintiff.

The *locus in quo* of the alleged trespass was a part of some fast land, which had been made by the Messrs. Coles, upon the shore of a cove in the Hudson river, in front of and adjoining their farm bordering upon the river. This shore was filled up and raised by them above the flow of the tide before the eighth of November, one thousand eight hundred and thirty-six.

I am of opinion that the plaintiff in error failed upon the trial below to support her plea of *liberum tenementum,* and that the judgment of the Supreme Court should be affirmed.

*First.* She established no title to the *locus in quo* through the survey and location of fifty-three and a half acres made by the board of proprietors of East Jersey to Elisha Boudinot, on the twenty-first day of May, one thousand eight hundred and three.

Although she had regularly deduced her claim to the rights supposed to have been created by that survey, yet it being

now well established, by the Supreme Court of this state and that of the United States, that the right of property in the soil covered by tide waters, in all arms of the sea and navigable rivers within this state, is vested in the state as a sovereign right subject to its dominion, the board of proprietors, in the year one thousand eight hundred and three, had no property in the subject-matter of that survey which could pass by their grant.

*Secondly.* The act of the legislature of this state, passed on the eighth of November, one thousand eight hundred and thirty-six, which is a grant to Nathaniel Budd, under whom the defendant holds and his assigns, of all the right and title of the state to the fifty-three and a half acres embraced in the Boudinot survey and location, cannot support the plea.

By the common law of England, the proprietor of lands bordering upon navigable tide waters carries his title to ordinary high water mark, and the soil beyond that line is vested exclusively in the crown, for the common benefit of the subjects, and is liable to parliamentary grants. Proprietors of such lands in New Jersey, from a very early period in her history, have enjoyed, for their individual benefit and in private ownership, privileges upon the shore adverse to the exercise of the sovereignty of the supreme power, excepting when employed for the protection of the common and paramount rights of navigation and of eminent domain.

The origin of such infringement upon the rules of the common law of England has not been satisfactorily traced ; but its existence has repeatedly been recognized in legislative enactments, and its enjoyment has been uninterruptedly claimed. One exercise by such proprietor of a right not supported by the doctrine of the common law of England regards exclusive fishery in front of his land.

Another, is an appropriation of the shore in front of his premises (that is the space between high and low water lines) to his own benefit, by filling in and raising ground above the operation of the water, and likewise in constructing docks and piers and wharves.

Such improvements, occasioning no serious inconvenience

to the enjoyment of the common rights of the citizens, but on the other hand, by aiding in the navigation of the public waters, increase the value of property within the state, have been sanctioned and encouraged by legislative action. Through long usage, the privilege of making these improvements has become a local custom in this state, and most valuable private rights in property have grown up and ripened in its exercise.

In the case before the court, the lessors of Gough, who were the undisputed owners of land washed by the tide waters of the Hudson, had reclaimed the *locus in quo* by filling with earth upon the mud flat of the shore in front of their land, and thus raising the surface above the dominion of ordinary tides, before the act of the legislature was passed upon which Mrs. Bell has rested this branch of her defence.

That statute appears to have embraced no public object, but it was enacted for the mere private benefit of Mr. Budd and his assigns.

If the lessors of Gough had the privilege, under the local custom of New Jersey, of reclaiming the shore in front of their farm, without injuring the rights of navigation or invading the sovereignty of the state (which I think they had) they have, by the application of their labor and capital upon that shore, acquired a vested right in the place reclaimed ; and Mrs. Bell, as the assignee of Budd, has obtained, by the said act of the legislature, no title to the improvement thus made by the Messrs. Coles.

I have reached this result upon the facts and the law of the case, without assuming, either that by the common law, as generally understood, an exclusive right to the use of the shores of navigable tide waters is an appurtenant to the adjoining land freed from the control of the sovereign power, excepting in matters of eminent domain, or that the legislature of New Jersey are restrained by such common law from granting for private purposes, in-the exercise of its wisdom and discretion, the soil below high water mark in beds of navigable tide streams, or from regulating the manner and extent of wharfing out into such navigable waters.

JUDGE CORNELISON.    There is so much diversity of opinion among the judges of this court upon the legal points raised in this case, and their practical importance .is so great, that it seems almost necessary that every judge should express his views· definitely on each point in writing, unless he concurs entirely with some one of the opinions presented.    As I do not agree fully with any, I give my own views on each point.

The first question is, as to the power of the legislature to make the grant to Budd.    If there was no such power, the defendant could have no title, as the title depends upon the grant.    That the people of the state, through their legislature, have no power to grant title to mud flats like these, because below high or low water mark, was to me a strange position, more especially as there is no pretence of limitation by the constitution of the state or of the United States.    My idea of our government is, that all power resides in the people ; that the legislature is the people exercising that power under the restrictions of the constitution.    The power of this court, and all courts, is only to determine what is the law, as enacted by the legislature, and what are the constitutional limits of their power.    We are not to decide whether a law is just or wise, or that, in the government of a well ordered people, some other restrictions ought not, by the constitution, to have been put upon the legislature.

As a legislator, I might not have been willing to vote for the grant to Budd, but as a judge, I must regard a law that I may think improper.    As a member of the constitutional convention, I perhaps might have said the legislature shall not have the power to obstruct the channel of navigable streams, but I never would have restrained them from appropriating marshes and mud flats, not navigable for useful purposes, because covered by water at high or low tide.    I should have thought the attempt very unwise, and that the matter in such case should be left in the power and discretion of the legislature.

The people of New Jersey, in 1776, as in 1844 confided all power to the legislature without such restriction.    I know of no principle on which we, because judges of the Court of Er-

Bell v. Gough.

rors, can, speculating philosophically on the proper power of government, interline in the constitution such restrictions on the legislative power as *we* think ought to exist in a well ordered government. Nor do I think that prudence, justice or public policy (had we the power) would dictate the inserting a restriction which would prevent the improvements of the meadows, marshes, and mud flats that surround our state. Many of these, as in this case, consist of hundreds of acres, too large to be converted into wharves or roads, or to other uses of a public nature, and must be made private property or ever remain unimproved.

Why is not this a good grant? This grant is for soil under navigable water. Is the title in the individual owning the upland? Does his deed cover it? It is not pretended. Who, then, has the title? Unquestionably the state. The title is in her. May she not grant it? Where is the limit to her authority? The grant is no violation of the constitution; the people have entered into no compact by which they are restrained from parting with that which is theirs. We have no right to say the grant is void because it does not comport with our notions of justice. If we declare the grant void, it must be upon some sound and settled principle of law.

In *Calder* v. *Bull*, 3 *Dall*. 386, the court say, " If any act of congress or of the legislature of a state violate the constitutional provision, it is unquestionably void. If, on the other hand, the legislature of the Union, or of any member of the Union, shall pass a law within the general scope of the constitutional powers, the court cannot pronounce it to be void, merely because it is in their judgment contrary to natural justice.

I think, therefore from principle, the legislature have this power; and if I had not arrived at this conclusion from a common sense view of the case, I should have felt bound by the authority of the opinions of the judges of the Supreme Court of the United States in the case of *Martin* v. *Waddell*, and even by that of C. J. Kirkpatrick, in the case of *Arnold* v. *Mundy*, 1 *Halst*. 78, who acknowledges the power of the legislature, putting in an arbitrary exception, without authority

or principle, in the case of the *navigable waters of the state only*.

A second question is, does the right of the shore owners extend to high or low water mark ? On this point the English law, which we have adopted, is clear and settled. It has been recognised by all, or nearly all the states, and which decisions we consider of much authority ; and I hold the law in New Jersey to be, that the shore owner goes to high water mark only.

Another point is, did not Coles acquire a right by filling in against his lands by the acquiescent permission of the state? If he did, and had acquired title, the grant of the state, which can give, and only did give the state's title, did not give Budd title to the place where the grass grew and was cut, or to the land filled in at the time of making the grant.

Although contrary to my first view, I have come to the conclusion that the reasoning of the Chief Justice is right on this point, and that the acquiescence by the people of the state for a century in such appropriation of the public domain has created a rule of law that we must notice, and that where a shore owner has filled in on the shore opposite his lands with the acquiescence of the state, *he owns it.*

On this ground, and on this only, I am of opinion that the judgment must be affirmed.

JUDGE VALENTINE. This was originally an action of trespass, brought in the Hudson Circuit by Edward Gough against Mary Bell, for breaking and entering plaintiff's close, and cutting and carrying away the grass there growing. The defendant pleaded title to the land in question. A verdict was taken for the plaintiff in the circuit upon a case stated, and afterwards judgment was ordered for the plaintiff in the Supreme Court.

It is now brought here by a writ of error from the Supreme Court. It was fully and ably argued in this court at the last term, but, on account of the important principles involved, it was held under advisement until the present term.·

The court now unanimously affirm the judgment of the court

below. But there is so much diversity of opinion among the judges of this court, that its judgment scarcely seems to settle any of the legal principles involved; and their practical importance being very great, it appears desirable that each member should give his opinion in writing.

It is admitted on both sides that the land where the alleged trespass was committed was below what was originally high water mark on the bay or cove commonly called Horsimus cove, opposite the city of New York.

The controversy was in reality between the rights of a riparian owner on tide water, who had docked out or filled up below high water mark, and the grantee of the state below and up to that line, and the cause would have been settled exclusively upon principles applicable to parties thus placed had Edward Gough, defendant in error, been willing to rest his cause upon the right of the riparian owner; but he attempted to overthrow the title set up by Mary Bell, plaintiff in error, by the production of the following paper titles, together with a claim as riparian owner:

1. Copy of patent of charter granted to the town and freeholders of Bergen, by Governor Carteret and council, under Carteret and Berkely, the lords proprietors, dated September 22, 1668.

This grant begins at the north end thereof, at a place called Mordanis' meadow, lying upon the west side of Hudson's river; thence running westwardly till it comes to Hackensack river; thence along said Hackensack river to Arthur Cull bay, opposite Staten island; thence eastwardly along Kill Van Cull to a neck of land called Constable's point or Constable's houck; and from thence to run up northward, all along the bay up *into* Hudson's river, till it comes to Mordanis' meadow aforesaid: and the grant further describes the whole tract as bounded at the north end by land belonging to Capt. Nicholas Verlett and Mr. Samuel Edsall, *on the east side by Hudson's river*, and the south end by Kill Van Cull, &c., "the whole, both upland and meadows and waist land, containing, according to the survey, 11,520 acres English measure, which said limits and bounds, together with all rivers, ponds, creeks, islands,

inlets, bays, fishing, hawking, hunting, and all other appurtenances whatsoever thereunto belonging and appertaining, *the half part of the gold and silver mines, and the royalties of the lords proprietors only excepted,* to continue and remain within the jurisdiction, corporation, or township of the said town of Bergen from the day of the date hereof and for ever, *the said corporation submitting. themselves to the authority of the lords proprietors and the government of this province,* to be holden by them, &c." The ninth clause in said patent reads as follows : "*that all lands and meadows that are appropriated and patented by particular persons before the day of the date of these presents shall continue and remain unto them without any alteration,* unless the proprietors thereof will give their consent to the contrary." In confirmation, &c., sealed and dated the 22d day of September, 1668.

In consequence of colonial discord, the governor and council surrendered their right of government to the crown, which was accepted by queen Anne on the 17th of April, 1702.

Afterwards Anne, queen of England, granted another patent to the town of Bergen, by which the power and authority of the town was increased and enlarged, and the inhabitants were incorporated by the name of the trustees of the freeholders of the township of Bergen. The description of the bounds of the township is again contained in this patent substantially as in the original patent. This patent or charter was confirmed by an act of the colonial legislature, passed at Burlington, February 2, 1713, and signed by Governor Hunter, July 16, 1713.

2. A deed of conveyance from the trustees of the freeholders of the township of Bergen to John B. Coles, dated February 4, 1804, for the consideration of $11,285 for part of the land contained in the aforesaid patent, " beginning at a post standing in the bounds or on the line between Paulus hook and Horsimus, near the side of the waters of the cove between Paulus hook and Horsimus; and from thence to run north seventy degrees fifty-four minutes west about fifty-two chains, to a stake standing on the northwest side of the road leading

from Prior's mills over Horsimus to Paulus hook, between upland and meadow, which stake bears to the middle chimney of Nathaniel Budd's house, north sixty degrees fifteen minutes east, also to the north chimney of the house of the widow Vanderhoff, north seventy-two degrees west; thence to run to the waters of the mill creek, otherwise called Horsimus creek, with a course of N. 35° W.; from thence along the said mill creek the several courses thereof as it runs, to the westerly end of a ditch, that was formerly cut to answer the purposes of a fence from said Horsimus creek to a small creek that runs out of the bay or cove between Horsimus and Hoboken creek; then along the said ditch to the said small creek; thence down along the said creek, as it runs, to the mouth thereof in the said cove between Horsimus and Hoboken; then down along cove *into* Hudson's river or York bay; then down said river or bay, *as the same runs*, till it strikes the division line *in said river* between Horsimus and Paulus hook; then westerly along said line to the place or point of beginning, together," &c., but specially excepting and reserving, as included within the limits and survey above described, the sundry parcels of land which are specially saved, excepted, reserved, and marked on the map of the commissioners appointed by an act of the legislature of the then province of New Jersey to make a general and particular partition and division of the common lands of the township of Bergen. Reference, &c.

3. Deed of John Kennedy and Robert Kennedy (by their attorney, Robert Watts,) to John B. Coles, dated February 4, 1804, with the power of attorney to Watts, for the consideration of $20,000, conveyed " all that tract of land lying in the township of Bergen upon Hudson's river over against New York, being that tract of land formerly called Horsimus, beginning at the fence at the northwest end of the causeway which leads from Paulus hook to Horsimus, and running from thence along the fence, as it now stands, north seventy-nine degrees west, three chains thirty-three links; thence north eighty-seven degrees thirty minutes west, four chains; thence north sixty degrees west, thirty-seven chains, to a small creek in the marsh which runs into the great creek or mill creek;

thence running down the same small creek to the great creek, and up the stream of the said great or mill creek, as it runs, to the bridge and causeway that crosses the same, which is nearly thirty-seven chains upon a straight line, and from the said bridge continuing up the stream of the said great or mill creek, as it runs, fourteen chains and a half, to a small gut that leads into a small creek which falls into Hudson's river; thence along the said gut, south eighty degrees east, three chains, to a bridge that crosses the gut; thence along the same course one chain, to the small creek aforesaid, which runs into Hudson's river; thence down Hudson's river, as it runs, to a fence near the beginning corner, which fence runs from the beginning corner aforesaid, south sixty-three degrees thirty minutes east, ten chains; and thence, north thirty-five degrees east, to Hudson's river, which tract of land, within the bounds aforesaid, contains four hundred and three acres strict measure." This deed and the deed from the trustees of the freeholders of Bergen is understood to be for the same premises, some dispute having before then arisen between the trustees and the Kennedys in relation to the title of the same, and is numbered lot No. 169 in the report of the commissioners who made partition of the common lands as aforesaid.

4. The following report of commissioners:

On the 7th day of December, 1763, the colonial legislature of New Jersey passed an act appointing Jacob Spicer, Charles Clinton, and others commissioners to make partition of the common lands of the township of Bergen among the several owners thereof, in proportion to their equitable rights. These commissioners made report (with Jonathan Hampton and George Clinton, two competent surveyors,) the 18th day of January, A. D. 1764. They proceeded to survey the township of Bergen, "beginning at the northeasternmost corner thereof, at a chesnut tree standing on the easterly end of a small narrow high ridge of land, marked, &c., and the said tree, on a course from it south forty-nine degrees east, is thirty-five links distant from the northeasterly side of Mordanis' meadow; said tree is fifty links from a small run of water, &c., and runs from said tree (1), north forty-nine degrees west, ninety-seven

chains, by a line of marked trees, to a stake standing by the
easternmost side of a small brook 1½ chains from its head ; (2)
down said creek, as it runs, to Hackensack river; (3) along
the Hackensack southwesterly till it comes to Newark or Ar-
thur Cull bay; (4) southwesterly along said bay to Kill Van
Cull, opposite Staten island ; (5) easterly along Kill Van Cull
to New York bay; (6) northerly along New York bay to the
mouth of Hudson's river; (7) northerly up along Hudson's
river to the southeasternmost point of Mordanis' meadow
aforesaid ; (8) northerly along the edge of said Mordanis'
meadow or marsh, where the same joins the upland, till it
comes to bear south forty-nine degrees east from the afore-
said chesnut tree ; (9) north forty-nine degrees west thirty-five
links, to the said chesnut tree, the place of beginning.  Having
thus run out and ascertained the general boundary and limits
of said township, proceeded to divide the same." Lot No. 172
in said division begins at a white-oak tree standing at the edge
of the bay, and runs first along Kill Van Cull to the edge of a
meadow, &c.

Lot No. 28 begins at a stake standing on the bank of York
bay, and runs first along the edge of the bay to a stake between
two cedars.

No. 29 begins at the above stake, and runs, &c.

All the lots which are adjoining the water call for monu-
ments on the bank, and none of their lines run expressly to
low water mark, excepting two small lots within the bounds
of No. 169 (the Coles lot), which two small lots the commission-
ers describe severally by metes and bounds ; and after their
description add to each of them, as appurtenant thereto, all the
land in front to low water mark.

The counsel for defendant in error contended that Governor
Carteret and council, at the time they granted the patent and
charter to the town and freeholders of Bergen, passed the ab-
solute power and right of government, and full authority to
convey the land under water in these rivers and bays where
the tide ebbs and flows ; that the patent and charter were
granted to a municipal corporation, giving them judicial au-
thority and the absolute right of government, and the fee

simple of the land contained in its boundary, together with all the soil covered with water where the tide ebbs and flows, including Horsimus bay, part of which is now in controversy in this suit. This they contend is manifest from the language of the patent and charter aforesaid. The also contend that, by a careful inspection of the report of the commissioners appointed to make partition of the common lands of the township of Bergen aforesaid, it will be manifest they considered the boundary contained in the patent extended to low water mark. As proof of this, they cited the description given by the commissioners of the two small lots contained in their report, within the general boundary of No. 169 of their report, as extending to low water mark (No. 169 being the Coles tract.)

The grant of king Charles II. to the Duke of York, his brother, dated the 20th day of March, 1664, did not only include the soil and inland streams and ordinary appurtenances, but also all waters, harbors, rivers, fishing, and all the royalties and advantages thereunto belonging, and the entire country, with the civil and political power of government, as fully and amply as he had power to grant them. Probably this grant is more extensive than those under which a number of the other colonists held.

On the 23d day of June, 1664, the Duke of York granted and conveyed to Lord Berkely and Sir George Carteret all New Jersey, including the royalties and power of civil government, as fully and amply, and in the same condition, in the bays, rivers, and arms of the sea, and the soil under water, as belonged to him under the original grant from king Charles.

Therefore, in the hands of Berkely and Carteret, this dominion and propriety was an incident to the regal authority, and was held by them as a prerogative right associated with the power of government, which power they continued to exercise from the date of their grant until their surrender of the prerogative right of government to the crown, which was accepted by Anne, queen of England, on the 17th of April, 1702. It is not seriously controverted at this day that Governor Carteret and council had not the right to make special grants to individuals for land below the ordinary high water mark in

those rivers and arms.of the sea where the tide ebbs and flows, from the date of the grant from the Duke of York to Berkely and Carteret, until the surrender of the government to queen Anne.

But I cannot find language in the patent from Governor Carteret and council to the freeholders of Bergen, which will sustain the construction put upon it by the counsel for defendant in error. Much stress and importance is given to the words contained in the last course of the boundary line in the patent, viz. "*up into Hudson's* river till it comes to Mordanis' meadow aforesaid, so that the whole tract of upland and meadow shall contain," &c. Mordanis' meadow, the beginning point of the survey, and Constable's point or Constable's houck, the last point of the survey, are evidently both above ordinary high water mark, from which latter point the patent "runs up northwardly all along the bay up *into* Hudson's river till it comes to Mordanis' meadow aforesaid."

A line has length but not breadth, therefore by running a line *into* the river, or along the low water mark, it would not hit or reach Mordanis' meadow, the beginning point called for ; but taking it for granted that the neck of land called Constable's point or Constable's houck is at ordinary high water mark, then by running along that line Mordanis' meadow would be reached, but by diverging from that line *into* the river it could not. The wording of the last line of the patent is explained by the nature of the case, and makes it very clear to my mind to mean a line to high water mark.

The beginning point of the deed from the trustees of the freeholders of Bergen is described as a post standing in the bounds or on the line between Paulus hook and Horsimus, near the side of the waters of the cove between Paulus hook and Horsimus, and runs, &c., " to the cove between Horsimus and Hoboken ; then down along said cove into Hudson's river or York bay ; then down said river or bay, as the same runs, till it strikes the division line in said river between Horsimus and Paulus hook ; then westerly along said line to the beginning, together," &c. This deed is from the trustees of the freeholders of Bergen. They show no title to land under water

in the cove or Hudson's river.   If they were only riparian owners, their deed conveys no land beyond ordinary high water mark.   But by the description of this deed, according to the testimony of Robert C. Bacot, a surveyor, " if the lines are run *into Hudson's river*, the last course cannot intersect the line between Jersey City and Horsimus (that line runs nearly north and south, or nearly parallel with the course of the river,) if you run the last course along the shore of the cove or ordinary high water mark it will intersect the line."   But this deed must be absurd without those lines, which appear to be at variance with each other, can be made to accord.

The deed from John Kennedy and Robert Kennedy to John B. Coles does not purport to extend at any one point beyond high water mark.   The commissioners appointed as aforesaid, who made partition of the common lands of Bergen, evidently understood the line along the bay and Hudson river to be a high water line.   They were very particular in the description of the beginning point of their survey, describing it as a chesnut tree standing thirty-five links from Mordanis' meadow: from said tree they run the several old lines of the patent till they come to the mouth of Hudson's river ; " thence (7) northerly up along Hudson's river to the southernmost point of Mordanis' meadow ; thence (8) northerly along the edge of said Mordanis' meadow or marsh where the same joins the upland, till their line comes to bear south forty-nine degrees east from the aforesaid chesnut tree ; thence (9) north forty-nine degrees west, thirty-five links, to the said chesnut tree or place of beginning, having thus run out and ascertained the general bounds and limits, proceeded to divide." &c.   The commissioners, in running their eighth line along the edge of the meadow, when they come opposite the beginning point, find themselves twenty-three feet southeasterly from it.   Hence they say they ran (9) north forty-nine degrees west, twenty-three feet, or thirty-five links, to the beginning point of the survey.

Now it cannot be believed that the commissioners would be thus particular in describing the eighth and ninth lines of their survey, and yet run their seventh line *into Hudson's river*, or

even along low water mark, and when they get opposite the southernmost point of Mordanis' meadow arbitrarily call their position the southernmost point of Mordanis' meadow, when it is evident the meadow does not run down to low water mark. The shore between high and low water mark is not meadow. If they had run their line along low water mark, when they diverged to the meadow they would undoubtedly have made mention of that fact, the same as in their ninth and short line.

These facts taken together, I think, abundantly prove that the commissioners ran their lines along the ordinary high water mark, and considered that the boundary. It may be asked why the commissioners did add and assign to the two small lots all the land in front of each of them to low water mark, if they considered the ordinary high water mark the boundary. The following reservations will be found in the ninth article of the patent and charter from Carteret and council to the freeholders of Bergen, *viz.* " all land and meadows that are appropriated and patented by particular persons before the day of the date of these presents shall continue and remain unto them without any alteration, unless the proprietors thereof will give their consent to the contrary," by which it appears that special grants had been made to individuals previous to the date of the patent to the freeholders of Bergen. Previous to the surrender of the government of New Jersey by Governor Carteret and council to the crown, in 1702, they undoubtedly had the power and authority to make special grants to individuals for land below ordinary high water mark. We have not the date of the grant for either of these two small lots; they must have been of those contained in the *reservation* mentioned in the ninth article of the patent, and the grant may have extended to low water mark. Hence the report of the commissioners in accordance with the grant. The grantees evidently did not claim as riparian owners.

I do not consider it material, in the settlement of this cause, whether Governor Carteret and council granted full power of government to the town and freeholders of Bergen or not ; but, as it was insisted upon by counsel, it may be well to examine

it. In the latter clause of the first article of said patent and charter, we find the following reservations: " the half part of gold and silver mynes and the royalty of the lords proprietors only excepted." And then the following clause is immediately added: " to continue and remain within the jurisdiction, corporation, or town of the said town of Bergen from the day of the date hereof and for ever, they, the said corporation, submitting themselves to the authority of the lords proprietors and the government of this province." This language does not appear compatible with the grant of sovereign power to a corporation. It is extremely doubtful whether Governor Carteret and council had the power and authority to sever the government of New Jersey, and grant absolute power of government to a municipal corporation. But to prevent any improper construction to the grant, the grantors expressly reserve all the regalia and royalties, together with half the gold and silver mines, with a declaration, that the said corporation should submit themselves to the authority of the lords proprietors and the government of this province; which language is so incompatible with the idea, of a grant of full power of government, that I consider comment unnecessary.

The defendant in error, having failed in this branch of title, what right had he as riparian owner ?

In New Jersey, the title of owners of land bounded by the sea, or by navigable rivers and arms of the sea, extends to ordinary high water mark only. The title to the shore between ordinary high and low water mark and the land under water belongs to the state. High water mark, therefore, is the boundary between the proprietary and sovereign titles in New Jersey, which doctrine is well settled in the case of *Arnold* v. *Mundy*, 1 *Halst.* 1 ; *Martin* v. *Waddell*, 16 *Peters* 367 ; also reported in 3 *Harr.* 495 ; 3 *Kent* 427.

The riparian owner has the right to the alluvial deposit, if it is imperceptibly made, because it cannot be identified and separated from his soil. But he has no right to extend and fix his own boundary at pleasure against the interest of the state or her grantee, and convert any amount of property to his own use. The state cannot be divested of her property in that

mode, and be made subject to the will and avarice of riparian owners. A contrary doctrine would allow the land owner the right to fill up to any extent in front of his bank, and at an enormous expense convert any amount of property rightfully belonging to the state to his own use. And should the state afterwards require this property for public use, she would have to pay for the labor and expense thus bestowed upon it, even if such labor and expense should render the property thus reclaimed of less value for public use.

There are three modes by which a sovereign may acquire title to a country—by conquest, discovery, or purchase. Ours was acquired by discovery, according to the principles of international law, as then understood by the civilized powers of Europe. The Indian tribes of America were regarded as mere temporary occupants of the soil, and the absolute right of property and dominion were held to belong to the European nation by which any particular portion of the country was first discovered. Whatever clemency or forbearance may have been exercised towards those Indians, either from humanity or policy, yet the territory they occupied was disposed of by the governments of Europe at their pleasure, as if it had been found without inhabitants. The grant to the Duke of York was not for land won by the sword, nor the government and laws he was authorized to establish intended for a conquered people, but was to be in conformity to the laws, customs, and manners of the English government. It is manifest he brought with him all the notions and prejudices incident to the common law customs of that country.

At the discovery of this country, according to the prerogative of the king of England, he held all the waste land and territory for his private benefit; and the sea, the arms of the sea, and all the navigable rivers, and the soil under those waters, as trustee for the public. He had the right to build wharves, docks, forts, light houses, and fixtures of every description, for the public good and convenience. He had the right to appropriate the whole shore of those waters for that purpose, if necessary, or such part thereof as he might think proper and needful. Did he lose that right by a grant of the

land? After a grant of land on a navigable river, measures may be taken to improve the navigation, though productive of remote and consequential damages to the banks. 2 *Hilliard's American Law* 90; 3 *Kent* 432, *note b.*

Then the sale of land to private individuals does not impair the right of the state in those improvements; it remains valid for ever, as limitation or *non user* does not impair the right of the state. At the Revolution, all those sovereign powers became vested in the people, where it now remains (excepting those surrendered to the general government of the United States), and where it will of necessity remain, until the people in their sovereign power shall decree otherwise.

The state of New Jersey, by virtue of her sovereign power then, had the right to build wharves, docks, and other works of a public nature on the shores of those waters up to high water mark in front of the riparian owner, and he had no right (previous to the passage of the act of March 18, 1851, *Pamph. L.* 335,) to anticipate the public, and fill out in front of his land and construct those works.

A man's water rights are held by as sacred a tenure as he holds the land from which they emanate. But the question is, what were the rights of a riparian owner, on those rivers and arms of the sea where the tide ebbs and flows, as against the rights of the state previous to the passage of the act of March 18, 1851? If a large number of vessels should be riding at anchor, or be afloat on the public water in front of the land of a riparian owner, he would have no right to order them off because he wanted to sail or land his own vessel there or moor her at anchor in front of his land; their rights are equal to his. As soon as he steps over his boundary he has no individual rights. His rights there are in common with other citizens; he has no right to order or regulate the movement of vessels on the public water in front of his land.

The learned counsel for defendant in error appealed to the sympathy of the court on account of the large amount of money that had been expended in reclaiming the land in controversy, and the rebuilding long dock in front of those lands; but it will not do for the court to allow their sympathy to per-

vert their judgment because large sums of money have been expended under misapprehension of title, or because any other large amount of property may be put in jeopardy by reason of a correct judgment of the court. The state will be slow to divest the owner of the shore of lands he may have reclaimed in front of his bank even for agricultural purposes, but more especially for building wharves, docks, and store houses for the public convenience, as well as for individual gain and enjoyment. But that does not disprove her right to do so, if she thinks proper. The court cannot interpose their authority ; that power is in the people, and they will in due time, through their legislature, correct all these matters.

In this view of the case, the defendant in error has shown only a possessory title.

Edward Gough, the defendant in error, being in possession of the land on which the alleged trespass was committed, it became incumbent upon Mary Bell, the plaintiff in error, to establish her title to said land ; in support of which she relies first upon a survey, made to Elisha Boudinot by the proprietors of East New Jersey for $53\frac{1}{2}$ acres, dated on the 21st May, 1803, and title deduced from thence through a regular chain of mesne conveyances to herself.

This survey lying entirely below the ordinary high water mark in the Hudson river or Horsimus cove (opening into the river) where the tide ebbs and flows, the proprietors had no right to make the survey, and their grant conveyed no title to Elisha Boudinot to the shore between ordinary high and low water mark nor the soil under the water.

The plaintiff in error, in further support of her title, relies upon a grant from the state of New Jersey, by virtue of an act of the legislature, passed on the 8th of November, 1836, (*Pamph. L.* 13) and title thence deduced through a regular chain of title to herself.

Two questions present themselves in deciding this branch of her title.

1st. The power of the legislature to make such grant.

2d. Whether title to the premises in dispute passed to Nathaniel Budd under the act of November 8, 1836.

The ancient rule of the common law. is, that the title of owners of land bounded by the sea or other navigable waters where the tide ebbs and flows extends to ordinary high water mark only.

The shore between ordinary high .and low water mark and the soil under the water belongs to the sovereign, as trustee for the public.    In England the crown, and in this country the people, have the absolute proprietary interest in the same, though it may, by grant or prescription, become private property.·  3 *Kent.* 427.

It would seem clear that in every government, whatever may be its form, there must be vested some ultimate dominion.    If the legislature of this state may dispose of the property of each individual member of the community for public good, it would seem to be no greater exercise of power to dispose of the common rights of all the people for the same end.    The legislature is restrained by constitutional provisions, and its powers abridged by fundamental laws.    But there is no constitutional restrictions imposed upon the legislature in making those grants; in making them, the legislature acts as the representatives of the people, and in their name.    The act of the legislature is the act of the people, not that of à mere trustee holding the legal title for public good.

I think there can be no doubt but the legislature has the right and power to grant and convey (for individual enjoyment) the land between ordinary high and low water mark and the soil under the water in the arms of the sea and those navigable rivers where the tide ebbs and flows, unless such grant will impair the compact with the United States regulating commerce or the trade and navigation between the states. If the grant is for private purposes, it loses its regalia and sovereignty, by which it is surrounded in the hands of the state, and the title of the grantee is put on an equal footing with other individual titles.    And the grantee would have no right to convert and change the nature of the soil to such purposes as would materially injure the rights of adjoining riparian owners.

The only question, then, to settle is, did the premises in

dispute pass to Nathaniel Budd under the act of November 8, 1836 ?

The title of said act purports to be "An act vesting in Nathaniel Budd all the right and title of the state of New Jersey to a certain tract of land *under water* in the Hudson river, in the county of Bergen and state of New Jersey." From which it would appear the legislature intended to convey only such land as was at that time *under water or below the ordinary flow of the tide.* As further evidence of that fact, part of the first section of said act read as follows, viz. "all the right and title of the state of New Jersey to a certain tract of land situate *along the beach* on the west side of the North river, or Hudson's river, and running into the same between Paulus hook and Hoboken, in the county of Bergen in the state of New Jersey, containing $53\frac{1}{2}$ acres, which was conveyed to the said Nathaniel Budd by Elisha Boudinot by deed," &c. If the provisions of the act had been such as to grant and convey to Nathaniel Budd, his heirs and assigns for ever, $53\frac{1}{2}$ acres of land, agreeably to a conveyance from Elisha Boudinot to Nathaniel Budd, by deed bearing date, &c., his, Budd's, grant from the legislature would have enclosed the land in question, and Mary Bell, the plaintiff in error, would have been entitled to judgment in her favor. But the testimony abundantly proves that, previous to the passage of the act of November 8, 1836, the land in controversy had been reclaimed, and *the beach on the west side* of Hudson's river (by manual labor) had receded from its original location. Yet as the act of 8th of November, 1836, makes the beach a boundary, (from the language of the act) it must be the beach as it then was, not as it had been at the date of the deed from Elisha Boudinot to Nathaniel Budd. Although the beach had been recently altered, it was before the grant from the state to Budd, and of such a character as to control the boundary.

I am therefore of the opinion that the act of the 8th of November, 1836, did not convey to Nathaniel Budd the title to the land from which the flow of the tide had been excluded by improvements previous to its passage.

Therefore the judgment below must be affirmed.

*For affirmance*—ELMER, NEVIUS, POTTS, OGDEN, SCHENCK, CORNELISON, ARROWSMITH, VALENTINE, and WILLS—8. .

*For reversal*—None.

Judgment affirmed.

CITED *in Cobb* v. *Davenport,* 3 *Vr.* 380 ; *Assoc. of Jersey Co.* v. *May., &c., Jersey City,* 4 *Hal. Ch.* 724 ; *Del. & Rar. Can. Co.* v. *Rar. & Del. Bay R. R. Co.,* 1 *C. E. Gr.* 366 ; *M. Can. & Bkg. Co.* v. *Cent. R. R. Co.,* 1 *C. E. Gr.* 431 ; *Keyport Sbt. Co.* v. *Farm. Tr. Co.,* 3 *C. E. Gr.* 23 ; *Stevens* v. *Newark & Pat. R. R. Co.,* 5 *C. E. Gr.* 135 ; *Atty Genl.* v. *Del. & B. B. R. R.,* 12 *C. E. Gr.* 8.